1　Randall E. Kay (State Bar No. 149369)
　　rekay@jonesday.com
2　JONES DAY
　　4655 Executive Drive, Suite 1500
3　San Diego, CA  92121.3134
　　Telephone:　+1.858.314.1200
4　Facsimile:　+1.844.345.3178

5　Marcus S. Quintanilla (State Bar No. 205994)
　　mquintanilla@jonesday.com
6　JONES DAY
　　555 California Street, Suite 2600
7　San Francisco, CA 94104.1501
　　Telephone:　+1.415.626.3939
8　Facsimile:　+1.415.875.5700

9　Attorneys for Plaintiff
　　MICRON TECHNOLOGY, INC.

10

11　　　　　　　　**UNITED STATES DISTRICT COURT**

12　　　　　　　**NORTHERN DISTRICT OF CALIFORNIA**

13

14　MICRON TECHNOLOGY, INC.,

15　　　　　　　　Plaintiff,

16　　　　v.

17　UNITED MICROELECTRONICS
　　CORPORATION, FUJIAN JINHUA
18　INTEGRATED CIRCUIT CO., LTD., and
　　DOES 1-10,
19
　　　　　　　　Defendants.
20

21

22

23

24

25

26

27

28

**Case No. 4:17-CV-06932-JSW**

**PLAINTIFF MICRON TECHNOLOGY, INC.'S OPPOSITION TO DEFENDANT UNITED MICROELECTRONICS CORPORATION'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

Judge:　　　　Hon. Jeffrey S. White
Courtroom:　　5, 2nd Floor
Hearing date:　March 23, 2018
Hearing time:　9:00 a.m.

Complaint Filed:　December 5, 2017

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.  SUMMARY OF ARGUMENT ........................................................................................... v

II.  RELEVANT FACTS ...................................................................................................... 1

III.  ARGUMENT .................................................................................................................. 4

    A.  The Court Has Specific Personal Jurisdiction over UMC Because Micron's Claims Arise from, and Relate to, UMC's Purposeful Contacts with California ......................................................................................................... 6

    B.  The Court Also Has Personal Jurisdiction over UMC Pursuant to Fed. R. Civ. P. 4(k)(2) ......................................................................................................... 9

    C.  UMC Cannot Satisfy Its Heavy Burden to Show that Exercise of the Court's Jurisdiction Would Be Unreasonable ....................................................................... 10

        1.  Extent of Defendant's Purposeful Interjection into the Forum ................... 11

        2.  Burden on Defendant of Defending in the Forum ...................................... 11

        3.  Extent of Conflict with Sovereignty of Defendant's State......................... 12

        4.  Forum State's Interest in Adjudicating the Dispute .................................... 12

        5.  Most Efficient Judicial Resolution of the Controversy .............................. 13

        6.  Forum's Importance to Plaintiff and Existence of an Alternative Forum ......................................................................................................... 14

    D.  If the Court Has Any Doubt Regarding Personal Jurisdiction over UMC, Micron Should Be Permitted to Conduct Jurisdictional Discovery ........................ 14

IV.  CONCLUSION ............................................................................................................. 15

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

4

C<small>ASES</small>

5

*Allstar Mktg. Grp., LLC v. Your Store Online, LLC,*
666 F. Supp. 2d 1109 (C.D. Cal. 2009) ....................................................................... 13

6

7

*Autodesk, Inc. v. Kobayashi + Zedda Architects Ltd.,*
191 F. Supp. 3d 1007 (N.D. Cal. 2016) ...................................................................... 11

8

9

*Ballard v. Savage,*
65 F.3d 1495 (9th Cir. 1995) ........................................................................................ 6

10

11

*Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.,*
No. CV 16-2499, 2017 WL 1105648 (E.D. Pa. Mar. 24, 2017) .................................... 8

12

13

*Burger King Corp. v. Rudzewicz,*
471 U.S. 462 (1985) ...................................................................................................... 6

14

15

*Butcher's Union Local No. 498 v. SDC Inv., Inc.,*
788 F.2d 535 (9th Cir. 1986) ...................................................................................... 15

16

17

*Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.,*
No. 15-cv-02177-SI, 2017 WL 1436044 (N.D. Cal. Apr. 24, 2017) .............................. 8

18

*Data Disc, Inc. v. Sys. Tech. Assoc., Inc.,*
557 F.2d 1280 (9th Cir. 1977) .................................................................................... 15

19

20

*Doe, I v. Unocal Corp.,*
248 F.3d 915 (9th Cir. 2001) ........................................................................................ 5

21

22

*Dole Food Co., Inc. v. Watts,*
303 F.3d 1104 (9th Cir. 2002) ......................................................................... 5, 9, 10, 11

23

24

*Enriquez v. Interstate Grp., LLC,*
No. 11-CV-05155 YGR, 2012 WL 3800801 (N.D. Cal. Aug. 31, 2012) ...................... 11

25

26

*Espetus Churrascaria, Inc. v. Espetus Braz. Steakhouse, Inc.,*
No. C 12-01256 JSW, 2012 WL 2590278 (N.D. Cal. July 3, 2012) ............................ 15

27

*Gates Learjet Corp. v. Jensen,*
743 F.2d 1325 (9th Cir. 1984) .................................................................................... 12

28

4:17-CV-06932-JSW

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
   328 F.3d 1122 (9th Cir. 2003)..................................................................................passim

*Holland America Line Inc. v. Wärtsilä North America, Inc.*,
   485 F.3d 450 (9th Cir. 2007)............................................................................... v, 5, 9

*Intermedics, Inc. v. Ventritex, Inc.*,
   822 F. Supp. 634 (N.D. Cal. 1993) .............................................................................. 7, 8

*ISI Int'l, Inc. v. Borden Ladner Gervais LLP*,
   256 F.3d 548 (7th Cir. 2001)............................................................................................. 9

*JustMed, Inc. v. Byce*,
   600 F.3d 1118 (9th Cir. 2010)................................................................................... v, 7

*Labor Ready, Inc. v. Williams Staffing*,
   LLC 149 F. Supp. 2d 398 (N.D. Ill. 2001).............................................................. v, 7

*Microsoft Corp. v. Mountain W. Computers, Inc.*,
   No. C14-1772RSM, 2015 WL 4479490 (W.D. Wash. July 22, 2015) ..................... v, 9

*Panavision Int'l, L.P. v. Toeppen*,
   141 F.3d 1316 (9th Cir. 1998)......................................................................................... 13

*Roth v. Garcia Marquez*,
   942 F.2d 617 (9th Cir. 1991)........................................................................................... 11

*Schwarzenegger v. Fred Martin Motor Co.*,
   374 F.3d 797 (9th Cir. 2004)............................................................................................. 5

*Sinatra v. Nat'l Enquirer, Inc.*,
   854 F.2d 1191 (9th Cir. 1988)......................................................................................... 12

*Summit Entm't, LLC v. Santia*,
   No. 2:11-cv-06310-ODW(SSx), 2014 WL 12577430 (C.D. Cal. June 24, 2014) ................... 10

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
   No. 17-cv-00561-WHO, 2017 WL 3485881 (N.D. Cal. July 15, 2017)................... 10

*Veronica Food Co. v. Ecklin*,
   No. 16-cv-07223-JCS, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ................... 7, 8

*Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*,
   433 F.3d 1199 (9th Cir. 2006) (en banc)............................................................... 5, 9

STATUTES

18 U.S.C. § 1831 ................................................................................................................. 13

18 U.S.C. § 1836(b) .............................................................................................................. 6

18 U.S.C. § 1836(d) .............................................................................................................. 8

18 U.S.C. § 1837(2) ...................................................................................................... v, 7, 8

18 U.S.C. § 1839(5)(A) ......................................................................................................... 6

18 U.S.C. § 1839(5)(B) .......................................................................................................... 7

OTHER AUTHORITIES

Chun-Hsien Chen, *Explaining Different Enforcement Rates of Intellectual Property
    Protection in the United States, Taiwan, and the People's Republic of China*, 10
    Tul. J. Tech. & Intell. Prop. 211, 241 (2007) .............................................................. 14

Fed. R. Civ. P. 4(k)(2) ...................................................................................................passim

H.R. Rep. No. 114-529 (2016) .................................................................................... 13, 14

Restatement (Third) of Unfair Competition § 40, cmt. c (1995) ......................................... 7

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

1    **I.     SUMMARY OF ARGUMENT**

2          Defendant United Microelectronics Corporation's ("UMC") Motion to Dismiss (Dkt. 27)

3    (the "Motion") should be rejected.  *See Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements*

4    *Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (summarizing specific-jurisdiction analysis).

5          The Court has specific jurisdiction because UMC knowingly engaged in misappropriation

6    – and acts in furtherance of misappropriation – in California.  At least one intrusion into California

7    is already a matter of public record: Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") and

8    UMC came to Silicon Valley where they *used* Micron's trade secrets to promote their venture to

9    potential hires based on an aggressive production schedule that would have been impossible but

10   for the theft of Micron's technology.  *See Labor Ready, Inc. v. Williams Staffing*, *LLC* 149 F.

11   Supp. 2d 398, 409-10 (N.D. Ill. 2001).  This was also a critical act *in furtherance of* their ultimate

12   use of Micron's secrets – full commercialization of Micron's technology.  *See JustMed, Inc. v.*

13   *Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010).  That act – and UMC's other U.S.-based acts in

14   furtherance of the misappropriation – are also a "but for" requirement for Micron's claims under

15   the DTSA.  18 U.S.C. § 1837(2).  By those acts alone, UMC submitted itself to this Court's

16   jurisdiction.

17         Micron also has made a *prima facie* showing of personal jurisdiction for a second,

18   independent reason.  Because Micron asserts federal causes of action – and because UMC has not

19   specified any other court in the United States where personal jurisdiction would be proper –

20   Micron has the right to invoke Fed. R. Civ. P. 4(k)(2) to aggregate UMC's California contacts with

21   its contacts involving the rest of the country.  *See Holland America Line Inc. v. Wärtsilä North*

22   *America, Inc.*, 485 F.3d 450, 461 (9th Cir. 2007).  Here, UMC knowingly aimed its misconduct at

23   Micron's home state of Idaho, and at California (where Micron's relevant business units are

24   based), and Delaware (Micron's state of incorporation).  Along with the inherent injury Micron

25   suffered in each locale, UMC obtained at least some of Micron's trade secrets by downloading

26   files directly from Micron's servers in Boise.  That injury and misappropriation are "but for"

27   causes of Micron's claims and fully support jurisdiction.  *See Microsoft Corp. v. Mountain W.*

28   *Comput., Inc.*, No. C14-1772RSM, 2015 WL 4479490, at *8 (W.D. Wash. July 22, 2015).

1

## II.    RELEVANT FACTS

2

Despite submitting two carefully limited declarations in support of its Motion (Dkt. 28 &

3

29), UMC does not dispute the most basic facts underlying Micron's complaint – many of which

4

are set forth in an Indictment already brought against UMC by Taiwanese prosecutors.  (*See*

5

Indictment (Compl. Ex. 1 (Dkt. 1-1 & 1-2).)  The facts summarized there provide only a partial

6

glimpse into UMC's misconduct, but they leave no doubt that Micron's claims are well founded.

7

Micron is one of the three global leaders in DRAM technology.  In addition to its

8

manufacturing facilities in the United States, Micron has invested billions of dollars in DRAM

9

operations throughout the world, including its acquisition of Rexchip Electronics Corp. in Taiwan

10

– a company it renamed "Micron Memory Taiwan Co. Ltd." ("MMT") in 2013.  (*Id.* § I, p. 2.)

11

UMC, in contrast, is a semiconductor foundry whose main business is to manufacture chips based

12

on its customers' designs.  (Mot. at 2:18-22.)  Years before any of the events at issue in this action,

13

UMC discontinued its limited, legacy DRAM business and began specializing as a foundry for

14

logic-process wafers – a very different semiconductor technology; by 2015, it did not even possess

15

its own DRAM design manual.  (Indictment §§ II, pp. 2-3 & V, p. 6.)

16

In 2015, Stephen Chen resigned as Site Director for MMT and joined UMC as Senior Vice

17

President.  (*Id.* § II, p. 3.)  In January 2016 – within months of Chen's departure from MMT and

18

his hire at UMC (and despite UMC's lack of background in DRAM technology) – Jinhua

19

negotiated a DRAM technology deal with UMC.  In exchange for $300 Million in equipment,

20

$400 Million in development fees, and fifty-percent ownership of the technology, UMC was to

21

develop DRAM manufacturing technology and transfer it to Jinhua for mass production of chips in

22

China.  (*Id.* § II, pp. 2-3.)  To implement the project, UMC formed a new unit – the so-called

23

"New Business Development" ("NBD") – with Chen in charge.  (*Id.* § II, p. 3.)

24

In addition to improperly providing UMC his "wealth of knowledge on virtually every

25

aspect of MMT's business" (Compl. ¶ 25) – Chen also recruited other MMT employees,[1]

26

---

27

[1] UMC asserts that "Micron does not accuse Chen of improperly taking any MMT trade secrets to UMC."  (Mot. at 3:19-20.)  That is not true.  Micron is confident that, in addition to his role directing theft by others, Chen himself was personally involved in acts of misappropriation.  The precise nature and extent of that misconduct can only be determined through discovery.

28

1   including Kenny Wang and J.T. Ho.  (Indictment §§ III & IV, pp. 3-5.)  As Taiwanese authorities

2   determined after search and seizure of their UMC computers, the men had retained hundreds of

3   Micron trade-secret documents after their departure from MMT so they could use them in their

4   work at UMC.  (*Id.* §§ III, pp. 3-4 & IV, p. 5.)  In particular, as Kenny Wang later confessed (*id.*

5   § VII, p. 8), he had been hired by UMC in March 2016 – even before he left MMT.  (*Id.* § IV,

6   p. 5.)  In his last days at the company:

> [B]eing fully aware that [Micron] and UMC are competitors in the development
> and manufacturing of DRAM and with the intent to use the information in
> Mainland China and to damage [Micron's] interest, Kenny Wang abused his
> authorization as the Product Quality Integration Manager by using MMT's
> laptop . . . to log on to MMT's server and to access [Micron's] electronic
> information relating to the method, technology, process and design of DRAM
> ("Electronic Record C," including a total of 931 files), which are protected trade
> secrets and copyrighted works.)  He stored Electronic Record C onto the
> abovementioned laptop, transferred it to a USB storage device . . . and then to two
> of his own laptops . . . and also uploaded it to his Google Drive (account number:
> brh5476@gmail.com).  (*Id.*)

13  Micron has determined that, in some of his improper downloading activity, Wang remotely

14  connected to Micron's Boise, Idaho servers and downloaded Micron's files from that location.

15  (*See* Declaration of Jonathan S. Heller, filed concurrently herewith ("Heller Decl.") ¶¶ 6-7.)

16  Moreover, as explained in the Indictment, when Wang copied the files for future use, he chose to

17  use Google's cloud service, which he knew to be headquartered in California and which –

18  according to UMC's own Motion papers – has the majority of its data-storage sites in the United

19  States.  (*See* Litts Decl., Ex. E (Dkt. 28-5).)  In sum, Wang – as an agent of UMC – knowingly

20  aimed his wrongful conduct at the United States and intentionally caused harm there to benefit

21  UMC.

22       But UMC did not stop at *acquiring* Micron trade secrets; it took almost immediate steps to

23  *use* them in its own operations.  The full extent of UMC's misconduct will remain hidden until

24  discovery, but one incident has already come to light:

> After joining UMC on April 28, 2016 . . . Kenny Wang . . . [accessed] Electronic
> Record C stored on Google Drive (account number: brh5476@gmail.com) and
> downloaded MMT's "DRAM design rules" (file name: [DR25nmS] . . .) and other
> electronic records. . . .
>
> Subsequently one day in July or August 2016, when attending the . . . morning
> meeting held by Leh-Tian Rong [a UMC Assistant Vice President who is also

under indictment], Kenny Wang was asked to stay in the meeting room . . . [to] discuss the draft of [UMC's] F32 DRAM design rules. . . .

Leh-Tian Rong, albeit fully aware that . . . the MMT information Kenny Wang possessed was likely obtained illegally, asked Kenny Wang to compare the F32 DRAM design rules of UMC with MMT's materials (i.e. the DR25nmS design rules), circle out the differences between the two, write down [Micron's] "stabilization data" on UMC's design rules . . . and help complete the parts including "Cell", "Array", and "Periphery" for Rong's review, so that UMC can complete the F32 DRAM design rules more quickly. . . .

After Kenny Wang provided the DR25nmS design rules production parameters, [UMC] skipped processes such as the optical lithography adjustment, etching and yellow light processes when developing the F32 DRAM. The design rules were completed within only 2 months and handed to the chip design manufacturer for the next step. (Indictment § V, pp. 5-7.)

Yet, even with the head start provided by Kenny Wang, neither UMC nor Jinhua could ultimately make full use of Micron's stolen secrets without hiring engineers and business people to place the misappropriated technology into mass production. To recruit the personnel they needed, in October 2016, UMC and Jinhua sent a joint delegation to an exclusive recruiting event hosted by the Chinese American Semiconductor Professional Association ("CASPA") in Silicon Valley. (*See* Declaration of Whonchee Lee, filed concurrently herewith ("Lee Decl.") ¶ 3 & Ex. 1.)

The CASPA event was attended by upwards of 30 guests and was led by representatives of Jinhua and by Stephen Chen for UMC. (Lee Decl. ¶¶ 4-10.) Jinhua's representative was the first person to address the group. He unveiled the project timetable and technology roadmap, which reflected that the first DRAM devices slated for manufacture were designated "F32 nm" and "F32S nm" – the very products whose aggressive production schedule had been made possible by UMC's misappropriation. (*Id.* ¶¶ 5-7; *cf.* Indictment § V, pp. 5-7.)



As explained in Micron's Complaint: "This ambitious roadmap, which would tend to assuage any concerns of job candidates that the project was distant or speculative, would not be possible without the use of the stolen Micron trade secrets." (Compl. ¶ 36.)

(Lee Decl. ¶ 6.)

Then Chen took the floor for UMC.  (Lee Decl., ¶¶ 9-10.)  He explained that UMC would first develop the F32 device (which, as Chen explained, corresponds to a 25nm process node) and then the F32S (a chip designed with a 20nm process node).  (*Id.*)  Tellingly, the very names "F32" and "F32S" had been the unique, internal product code names used by Elpida (which was later acquired by Micron and whose technology had been licensed to MMT).  (Compl. ¶ 36.)  Chen's apparent aim was to help potential new hires overcome whatever doubts they may have had concerning the project's ultimate viability.  As explained in Micron's Complaint, he "knew and intended that the recruitment of top talent in Silicon Valley would enable UMC and Jinhua to make optimal use of Micron's trade secrets in the development and operation of Jinhua's DRAM project."  (Compl. ¶ 35.)

At the conclusion of the presentations, Chen and the Jinhua representatives met with prospective applicants (Lee Decl., ¶ 15), but Micron is currently unaware what they did next or where they travelled.  What is clear – based on UMC's own submissions in support of its Motion – is that UMC and Jinhua received a number of résumés at the CASPA event, and that a single UMC HR manager, Jennifer Wang, was in charge of handling the résumés on behalf of both UMC and Jinhua.  (*See* Wang Decl. ¶ 2 (Dkt. 29).)[2]

Regardless of UMC's further actions in the United States, UMC does not dispute that it and Jinhua have continued to move forward with their DRAM project.

## III.   ARGUMENT

The law governing the Court's personal-jurisdiction analysis is well settled.  It requires a three-part test:

---

[2] It is likely that UMC channeled its recruitment-related activities through UMC Group (USA) – a wholly owned subsidiary based in Sunnyvale, California – which it describes as the entity through which it makes its sales in North America (a full 43 percent of its sales worldwide).  *See* UMC SEC Form 20-F (Dec. 31, 2016) (Litts Decl., Ex. C (Dkt. 28-3) at 11); UMC 4Q2017 Financial Review at 8 <<http://www.umc.com/English/pdf/UMC17Q4_financial_presentation-E.pdf.>> Micron would undertake discovery to determine the full extent of UMC Group (USA)'s involvement, but one publicly available fact is noteworthy: UMC's own job posting on the CASPA website advertises openings at UMC in Sunnyvale and in Taiwan, and it makes no distinction between the two companies. <<http://www.caspa.com/jobs/sponsors-jobs/job-list/5710d4878c14d4e571c8bb6f.>>  What is more, it requests that résumés for all positions – including the engineering positions in Taiwan – be sent to UMC Group (USA)'s email address: "career@umc-usa.com."

1
2
3
4

(1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

5   *Harris Rutsky*, 328 F.3d at 1129 (emphasis in original; internal citations omitted).  Within this

6   framework, a "purposeful direction" analysis is most often used in tort cases (*Schwarzenegger v.*

7   *Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)) and the Ninth Circuit typically

8   evaluates "purposeful direction" under a three-part "effects" test.  That test: "[R]equires that the

9   defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state,

10   (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* at 803

11   (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  The plaintiff,

12   however, need not have suffered the "brunt" of its harm in the forum.  *Yahoo!, Inc. v. La Ligue*

13   *Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc).

14       Ordinarily, the Court's due-process analysis considers the defendant's contacts with a

15   particular forum state.  However, if there is no U.S. jurisdiction in which defendant would be

16   amenable to suit, and if the plaintiff's claims arise under federal law, Fed. R. Civ. P. 4(k)(2)

17   provides a federal long-arm statute that allows the plaintiff to rely on the defendant's contacts not

18   only with the forum state, but with the United States as a whole; jurisdiction attaches as long as the

19   defendant's aggregate contacts with the United States support personal jurisdiction under

20   constitutional due-process standards.  *Holland America*, 485 F.3d at 450.

21       If the district court does not conduct an evidentiary hearing, the plaintiff need only make a

22   *prima facie* showing of jurisdiction to defeat the defendant's motion and, unless directly

23   controverted, the plaintiff's "version of the facts is taken as true, and 'conflicts between the facts

24   contained in the parties' affidavits must be resolved in [plaintiff's] favor. . . .'" *Harris Rutsky*, 328

25   F.3d at 1129 (quoting *Doe, I v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001)).  The burden lies

26   with the plaintiff to show that the defendant purposefully directed its activities at the forum and

27   that plaintiff's claims relate to those purposeful contacts.  Once that showing is made, the

28   defendant can avoid jurisdiction only by presenting "a compelling case that the presence of some

other considerations would render jurisdiction unreasonable." *Id.* at 1132 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In light of these controlling standards, UMC's jurisdictional challenge is not tenable.  Even without discovery, the evidence is abundant that UMC purposefully directed its actions both at California and the United States, and that Micron's claims arise out of, and relate to, those activities.  UMC has not shown that the Court's exercise of jurisdiction would be unreasonable.

### A.    The Court Has Specific Personal Jurisdiction over UMC Because Micron's Claims Arise from, and Relate to, UMC's Purposeful Contacts with California.

UMC does not dispute that the acts alleged in Micron's Complaint include purposeful acts aimed at California.  Even at this early stage of the case, Micron is aware of at least one such contact – the joint delegation by UMC and Jinhua to the CASPA recruiting event in Silicon Valley.  That recruiting mission was obviously purposeful.

UMC's attack on the Court's jurisdiction centers on the second prong of the due-process analysis: UMC asserts that Micron's claims do not "arise out of or relate" to the CASPA event because the CASPA mission was not a "but for" cause of Micron's claims.  (*See* Mot. at 8:14-20 (citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995))).  According to UMC: "All of [Micron's] claims would have existed regardless of UMC's single effort to recruit potential employees in this District. . . .  [T]he acts of alleged trade secret theft were completed – in Taiwan – before UMC's contact with California." *Id*. at 8:22-25 (emphasis omitted).  *UMC's jurisdictional challenge fails because this – its major premise – is false.*

The basic elements of Micron's DTSA claim show that UMC's recruitment efforts were themselves acts of misappropriation and were acts in furtherance of misappropriation.  The statute provides that "[a]n owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b).  The law defines "misappropriation" broadly to mean improper "acquisition" of a trade secret (18 U.S.C. § 1839(5)(A)) as well as "disclosure" or "use" of a trade secret, *inter alia*, "by one who used improper means to acquire knowledge of the trade secret."  18 U.S.C. § 1839(5)(B).  The key terms of the DTSA are substantially identical to the

same terms in the UTSA, from which they were drawn.  *See, e.g., Veronica Food Co. v. Ecklin*, No. 16-cv-07223-JCS, 2017 WL 2806706 at *12-13 (N.D. Cal. June 29, 2017) (citing statutes and collecting cases).

The UTSA, in turn, defines the kinds of use that can constitute misappropriation broadly: "There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade secret. . . .  As a general matter, any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section." *JustMed, Inc.,* 600 F.3d at 1130 (citing Restatement (Third) of Unfair Competition § 40, cmt. c (1995)).

Finally, a civil action under the DTSA is available for conduct occurring outside the United States, but only if "an act in furtherance of the offence was committed in the United States." 18 U.S.C. § 1837(2).  In other words, *one or more U.S.-based acts in furtherance of the misappropriation is a "but for" requirement for a DTSA claim.*

Here, Micron alleges that its trade secrets have been misappropriated – both by being wrongfully *acquired* (*e.g.*, the improper downloading by Wang and others) and by being wrongfully *used*.  (Compl. ¶¶ 27-29, 31-33.)  As regards UMC's wrongful use of its technology, Micron alleges that UMC's actions at the CASPA recruiting event constituted an improper *use* of Micron's trade secrets.  *See*, *e.g., Labor Ready*, 149 F. Supp. 2d at 409-10 (defendants efforts to recruit personnel through use of plaintiff's trade secrets constituted misappropriation through "use" under the UTSA).  Moreover, Micron also alleges that those same recruitment efforts were acts *in furtherance of* an even more elaborate use of Micron's technology: the full commercialization of the stolen technology.  (Compl. ¶¶ 35-36.)

UMC's recruiting efforts – and other U.S.-based acts (described below) – are "but for" causes of Micron's claims because they constitute acts of misappropriation and acts in furtherance of misappropriation *in the United States*. "But for" acts like the CASPA event – and other U.S.-based acts in furtherance of UMC's misappropriation  – UMC's claim under the DTSA would not have accrued.  *See* 18 U.S.C. § 1837(2).

UMC attempts to avoid this result by asserting that Micron's claims had already arisen by the time of its Silicon Valley recruitment efforts, and by relying on *Intermedics, Inc. v. Ventritex,*

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

*Inc.*, 822 F. Supp. 634, 650 (N.D. Cal. 1993) for the proposition that "any subsequent additional acts of misappropriation . . . cannot be considered 'in furtherance' of the alleged conspiracy." (Mot. at 9:4-12.)  UMC misstates the facts and the law.

*Intermedics* is a statute-of-limitations case.  It addresses whether, in the context of a trade-secret misappropriation, each continuing use of the secret triggers a new limitations period.  Emphasizing the importance of discouraging stale claims, the court found that a continuing or renewed misappropriation would not restart the clock for limitations purposes (*id*. at 653), and that ruling is consistent with the text of the DTSA itself.  *See* 18 U.S.C. § 1836(d) ("For purposes of [limitations periods], a continuing misappropriation constitutes a single claim of misappropriation").

The holding of *Intermedics*, however, does not address whether, liability and jurisdiction under the DTSA can arise from improper use of a trade secret long after the trade secret was improperly obtained.  By making any improper use of a stolen trade secret a separate tort, independent of the initial theft, the DTSA plainly does fix liability on acts of misuse that come well after the plaintiff's trade secret was first stolen.  That is why courts have consistently held that the DTSA applies even to misappropriations that began prior to the DTSA's enactment, as long as the misappropriation continues to occur after the enactment date and the defendant took some relevant act after the law came into force.  *See Veronica Food Co.*, 2017 WL 2806706 at *13 (citing *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No. CV 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (collecting district-court decisions nationwide), and *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, No. 15-cv-02177-SI, 2017 WL 1436044 at *4 (N.D. Cal. Apr. 24, 2017)).

In sum, UMC's use of Micron trade secrets while in California – and its acts in furtherance of such use – satisfy the "but for" test.  Without such U.S.-based acts in furtherance of UMC's wrongdoing, Micron would have no claim under the DTSA.  *See* 18 U.S.C. § 1837(2).  In addition, Micron suffered jurisdictionally relevant injury in California: Micron's Milpitas facility, located in this District, employs roughly 450 professionals including the executive leadership of the company and of the business units that market Micron's DRAM products.  (*See* Declaration of Michael L.

MICRON'S OPPOSITION TO UMC'S MOTION TO DISMISS

Myers, filed concurrently herewith ("Myers Decl.") ¶ 4.)  These are the business units most directly harmed by UMC's theft.  *See Yahoo! Inc.*, 433 F.3d at 1207 (jurisdictionally relevant injury need not be plaintiff's only or primary injury); *Dole*, 303 F.3d at 1113 ("We need not choose one criterion as the predominant indicator of where a corporate plaintiff suffers economic injury.  Nor do we need to choose a single forum, for jurisdictionally sufficient harm may be suffered in multiple forums." (internal citations omitted)).

### B.    The Court Also Has Personal Jurisdiction over UMC Pursuant to Fed. R. Civ. P. 4(k)(2).

Assuming, *arguendo*, that UMC's known California contacts did not suffice for jurisdiction, the Court nevertheless has jurisdiction under Fed. R. Civ. P. 4(k)(2).  As explained above, where, as here, the plaintiff asserts federal claims, Rule 4(k)(2) allows the Court to aggregate UMC's California contacts with the contacts it has established with the rest of the country.  In the Ninth Circuit, to prevent the court from applying a Rule 4(k)(2) analysis, the burden lies with the defendant: either it must stipulate that personal jurisdiction would lie in another U.S. jurisdiction, or it concedes that the first prong of the Rule 4(k)(2) test is met.  *Holland America*, 485 F.3d at 461 (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).  Here, UMC has not suggested that it would be subject to personal jurisdiction in any state other than California.  Especially when combined with the California contacts, UMC's contacts with the rest of the United States plainly support an exercise of jurisdiction.

*First*, Wang – as an agent of UMC – accessed and downloaded Micron's trade secrets directly from the company's servers in Boise.  (Heller Decl. ¶¶ 6-7.)  Micron believes Wang was consciously aware that he was accessing Micron's servers in Idaho for at least some of the wrongful downloading but, even if he was not actively aware of the servers' location, Wang's downloading from Idaho supports jurisdiction.  *See e.g., Microsoft Corp.*, 2015 WL 4479490, at * 7:

> Regardless of whether Defendants knew where Plaintiff's servers were located, Defendants admit[ted] that they knew Microsoft is located in Washington.  Even though Defendants' contacts with Plaintiff were made remotely, they knew Plaintiff to be located in and operating out of the State of Washington.  The allegations in this case are that Defendants accessed Plaintiff's computer servers to unlawfully

validate unlicensed software in violation of trademark and copyright laws. Such allegations, if true, satisfy the "express aiming" element.

*Accord Synopsys, Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO, 2017 WL 3485881, at*25-26 (N.D. Cal. July 15, 2017) (even if defendant did not know of server location, plaintiffs "detailed allegations [about plaintiff] being headquartered in California and [defendant's] knowledge of the same given its experience in the industry" made it "sufficiently plausible to infer knowledge or reckless disregard on the part of" defendant that it was improperly accessing the plaintiff's network in California and supported personal jurisdiction); *Summit Entm't, LLC v. Santia*, No. 2:11-cv-06310-ODW(SSx), 2014 WL 12577430, at *3 (C.D. Cal. June 24, 2014) ("Defendants purposefully availed themselves of the benefits and protections of California by accessing, viewing, and downloading content from the films from Summit's servers. . . . The servers are located in California.").

 *Second*, UMC caused Micron considerable harm in Idaho (Micron's corporate domicile), in California (where the relevant business units are based), and in Delaware (Micron's states of incorporation). *See Dole*, 303 F.3d at 1113 (finding that a corporation may suffer harm in multiple jurisdictions).

 *Third*, UMC committed those concrete DTSA violations in the context of a much wider interjection into the United States. As described above (n. 2, *supra*), roughly 43 percent of UMC's sales come from the United States, and UMC Group (USA) – the wholly owned subsidiary through which it makes those sales – also apparently facilitates its recruiting for engineering positions in Taiwan. Those are precisely the kinds of positions that UMC needs to fill to make the most effective use of the stolen Micron technology. In addition, Wang also stole Micron's trade secrets by copying them to his Google cloud account; Wang had to have known that Google is based in the United States and, as UMC's own filings concede, the majority of Google's servers are in the United States – not Taiwan. (Litts Decl., Ex. E (Dkt. 28-5).) This wealth of contacts further supports the exercise of jurisdiction.

**C.** **UMC Cannot Satisfy Its Heavy Burden to Show that Exercise of the Court's Jurisdiction Would Be Unreasonable.**

Given Micron's showing on the first two prongs of the personal-jurisdiction analysis, UMC

1    bears the heavy burden of showing that the Court's exercise of jurisdiction would nevertheless be

2    unreasonable, based on seven factors – none of which is dispositive.  *Harris Rutsky*, 328 F.3d at

3    1132 (internal citations omitted).  That test does not mandate a simplistic counting up of factors:

4    even when more factors incline away from jurisdiction than toward it, the analysis can be deemed

5    essentially "a wash," and the defendant does not meet its burden.  *Id.* at 1134 (citing *Roth v.*

6    *Garcia Marquez*, 942 F.2d 617, 625 (9th Cir. 1991)).  *See also Dole*, 303 F.3d at 1117 ("A number

7    of our cases emphasize the heavy burden on both domestic and foreign defendants in proving a

8    'compelling case' of unreasonableness to defeat jurisdiction.").  "For the Court's exercise of

9    jurisdiction to be unreasonable, the burden of defending in California must be 'so gravely difficult

10   and inconvenient' that it violates due process."  *Enriquez v. Interstate Grp., LLC*, No. 11-CV-

11   05155 YGR, 2012 WL 3800801, at *6 (N.D. Cal. Aug. 31, 2012).  As shown below, UMC cannot

12   present a "compelling case" that the Court should decline jurisdiction.

13   **1.    Extent of Defendant's Purposeful Interjection into the Forum**

14        The Ninth Circuit has found this factor favors jurisdiction where twenty-percent of a

15   defendant's business is conducted in a given state, without regard to whether the plaintiff's claim

16   arose out of, or was related to, all such business.  *Harris Rutsky,* 328 F.3d at 1132 (internal citation

17   omitted).  Here, UMC's interjection into the U.S. market is far more significant.  In addition to

18   making nearly half of its sales from the U.S., UMC has even established a subsidiary here.  And,

19   while a parent-subsidiary relationship alone is insufficient to attribute the contacts of the

20   subsidiary to the parent, it is obviously relevant to show the parent's interjection into the forum.[3]

21   **2.    Burden on Defendant of Defending in the Forum**

22        This factor almost always weighs at least slightly against jurisdiction.  However, the Ninth

23   Circuit has given this factor relatively little weight – particularly where the defendant "frequently

24   travel[s] to California on business."  *Harris Rutsky*, 328 F.3d at 1132-33.  *See also*, *Autodesk, Inc.*

25   *v. Kobayashi + Zedda Architects Ltd.*, 191 F. Supp. 3d 1007, 1019 (N.D. Cal. 2016) (rejecting

26

27   ───────────────
     [3] A subsidiary's contacts can be attributed to the parent under two circumstances: where the
     subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent.
28   *Harris Rutsky*, 328 F.3d at 1134 (internal citations omitted).  Micron has not had discovery to
     determine whether UMC Group (USA) satisfies either of these conditions with respect to UMC.

1    claim of burden where defendant used technology and transportation to carry on the business and

2    had secured counsel in forum) (internal citations omitted).

3         UMC's burden is even less here, given that UMC Group (USA) is located in this District.

4    *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988) (continuing contacts

5    between defendant's U.S.-based agent and California translate into less burden than if defendant

6    maintained no presence or agent in U.S.).  In fact, UMC was recently involved in litigation in this

7    district where it successfully moved for the case to be transferred from the Eastern District of

8    Texas.  In the Texas action, UMC argued that this District was a more convenient forum, and one

9    in which it could be subject to personal jurisdiction.  (Myers Decl. ¶ 5.)  As UMC explained, "trial

10   in Northern California would be significantly more convenient for UMC Taiwan's potentially

11   relevant employees than in Texas because California is much closer to where those employees

12   reside and work, and because those employees could work at UMC USA's offices in Sunnyvale,

13   California if required to travel to Northern California in connection with [the] lawsuit."  (*Id.*)

14              **3.    Extent of Conflict with Sovereignty of Defendant's State**

15        "Although this factor is important, it is not controlling." *Harris Rutsky*, 328 F.3d at 1133

16   (citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984) ("If [this factor were]

17   given controlling weight, it would always prevent suit against a foreign national in a United States

18   Court.")).  In any case, here, the supposed conflict between U.S. jurisdiction and Taiwanese

19   sovereignty is minimal.  As the record shows, Micron has cooperated fully with Taiwanese

20   authorities.  (*See, e.g.,* Indictment, p. 9 (referencing evidence provided by Micron witnesses to

21   Taiwanese authorities).)  If anything, Micron's suit against UMC and Jinhua is complementary to

22   the police efforts of Taiwan.

23              **4.    Forum State's Interest in Adjudicating the Dispute**

24        Because Micron grounds the Court's jurisdiction on California's long-arm statute, as well

25   as Rule 4(k)(2), the interests of two different fora must be assessed – California and the United

26   States.  Both have a substantial interest in this Court adjudicating the dispute.

27        Contrary to UMC's assertions, California has a significant interest in the case,

28   notwithstanding that Micron is domiciled in Idaho.  California generally, and the Northern District

in particular, are home to the world's most important semiconductor community and certainly

several of UMC's largest customers.  California has a strong interest in preventing any of those

companies from buying goods or services tainted by UMC's misappropriation.  *Cf. Allstar Mktg.*

*Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1125 (C.D. Cal. 2009) (California

had interest in adjudicating trademark case to prevent confusion by California consumers) (internal

citation omitted).  California also has an interest in protecting Micron's California-based business

units from competitive harm – from UMC sales either in the U.S. or abroad.

Applying Rule 4(k)(2), and considering the interests of the United States, the legislative

history to the DTSA leaves no doubt that Congress viewed it as an imperative public interest to

provide U.S. technology companies a federal, private right of action to defend against

misappropriation taking place abroad.  Explaining the rationale behind the DTSA's civil-action

provision, Congress recognized

> the "significant and growing threat presented by criminals who engage in espionage
> on behalf of foreign adversaries and competitors. . . . The EEA, enacted in 1996 and
> codified at 18 U.S.C. §§ 1831 *et seq.* makes it a Federal criminal offense to
> misappropriate a trade secret that has an interstate or foreign nexus. . . .  However,
> the FBI does not have the resources to investigate every case of trade secret theft.
> And the EEA, as a criminal statute, is not suited to making whole the victims of
> misappropriation."

H.R. Rep. No. 114-529 at 3-4 (2016).  In short, Congress expressed the national interest in

enlisting civil enforcement against foreign violators of trade secret laws.

**5.      Most Efficient Judicial Resolution of the Controversy**

This factor typically turns on which forum will provide the litigants with better access to

proof.  "[T]his factor is 'no longer weighed heavily given the modern advances in communication

and transportation'" and, for that reason, the Ninth Circuit has sustained the reasonableness of

personal jurisdiction even where almost all of the evidence and potential witnesses reside outside

the United States.  *See Harris Rutsky*, 328 F.3d at 1133 (quoting *Panavision Int'l, L.P. v. Toeppen*,

141 F.3d 1316, 1323 (9th Cir. 1998)).

Here, however, contrary to UMC's assertion, it is not true that all or most of the evidence is

in Taiwan.  Much of the most important evidence is in the United States – from technical details

about Micron's technology, to the measures the company took to protect its secrets, to the forensic

1   evidence of UMC's misappropriation, to the economic damage that UMC's misconduct has

2   caused.  (Myers Decl. ¶ 6.)  Further, whatever the physical location of the documents or witnesses,

3   there is no pre-trial discovery in Taiwanese civil litigation.  *See* Chun-Hsien Chen, *Explaining*

4   *Different Enforcement Rates of Intellectual Property Protection in the United States, Taiwan, and*

5   *the People's Republic of China*, 10 Tul. J. Tech. & Intell. Prop. 211, 241 (2007).  As a practical

6   matter, proof will be more readily available to both parties in a U.S. litigation.

7   **6.     Forum's Importance to Plaintiff and Existence of an Alternative Forum**

8          The sixth and seventh reasonableness factors counterbalance one another: the importance

9   of the forum to the plaintiff's interest in convenient and effective relief *versus* the possibility that

10  another forum is available.  UMC contends that factor six weighs against jurisdiction precisely

11  because – jumping to factor seven – "Micron may pursue its claim in Taiwan or elsewhere."  (Mot.

12  at 13:19-26.)  But UMC's flawed logic flies in the face of Congress's unambiguous mandate:

13          American businesses that compete globally will lose their competitive edge if they
            cannot quickly pursue and stop thieves looking to shortcut the innovative products,
14          designs, and processes that have fueled our economy.  This bill will equip
            companies with the additional tools they need to protect their proprietary
15          information. . . . As trade secret owners increasingly face threats from both at home
            and abroad, the bill equips them with the tools they need to effectively protect their
16          intellectual property and ensures continued growth and innovation in the American
            economy.
17
18  H.R. Rep. No. 114-529 (2016) at 6.  With this statement of purpose, there can be no doubt: in

19  enacting the DTSA, Congress believed it was *necessary* to provide U.S. businesses with a U.S.

20  forum to obtain effective protection of their trade secrets and redress when those secrets are

21  misappropriated abroad.  That there may, in theory, be some alternative forum where Micron

22  could attempt to assert its rights obviously does nothing to alter Micron's interest – and the

23  national interest – in having its federal claims adjudicated here.

24  **D.     If the Court Has Any Doubt Regarding Personal Jurisdiction over
            UMC, Micron Should Be Permitted to Conduct Jurisdictional
25          Discovery.**

26         Micron submits that it has made its *prima facie* showing of personal jurisdiction, and asks

27  the Court to direct UMC to answer the Complaint.  However, if the Court has any doubt regarding

28  personal jurisdiction, Micron should, at the very least, be permitted to conduct jurisdictional

1   discovery.

2          "The Court has broad discretion in determining whether to permit jurisdictional discovery."

3   *Espetus Churrascaria, Inc. v. Espetus Braz. Steakhouse, Inc.*, No. C 12-01256 JSW, 2012 WL

4   2590278, at *6 (N.D. Cal. July 3, 2012).  But "discovery should ordinarily be granted where

5   'pertinent facts bearing on the question of jurisdiction are controverted or where a more

6   satisfactory showing of the facts is necessary.'"  *Butcher's Union Local No. 498 v. SDC Inv., Inc.*,

7   788 F.2d 535, 540 (9th Cir. 1986) (internal citation omitted).  A district court abuses its discretion

8   if the denial of discovery "results in actual and substantial prejudice to the complaining litigant."

9   *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 n. 1 (9th Cir. 1977).

10          Here, numerous jurisdictional facts could be expanded on through discovery, *inter alia*: (1)

11   the extent to which UMC or its agents knowingly accessed Micron's trade secrets from servers in

12   the United States; (2) whether the CASPA recruiting event – and any other trips to the U.S. –

13   aimed to employ personnel needed to commercialize technology stolen from Micron; and (3) the

14   role UMC Group (USA) played in the UMC-Jinhua conspiracy.  If Micron were denied discovery

15   on these and other related issues, and its case were dismissed, Micron would be substantially

16   prejudiced.

17   **IV.     CONCLUSION**

18          For the reasons set forth above, UMC's Motion to Dismiss for Lack of Personal

19   Jurisdiction should be denied.

20    Dated:  March 1, 2018                              JONES DAY

21

22                                                    By:  *s/ Randall E. Kay*
                                                          Randall E. Kay
23                                                        Marcus S. Quintanilla

24                                                    Attorneys for Plaintiff
                                                      MICRON TECHNOLOGY, INC.
25

26

27

28   NAI-1503460726

1  Randall E. Kay (State Bar No. 149369)
   rekay@jonesday.com
2  JONES DAY
   4655 Executive Drive, Suite 1500
3  San Diego, CA  92121.3134
   Telephone:     +1.858.314.1200
4  Facsimile:     +1.844.345.3178

5  Marcus S. Quintanilla (State Bar No. 205994)
   mquintanilla@jonesday.com
6  JONES DAY
   555 California Street, Suite 2600
7  San Francisco, CA 94104.1501
   Telephone:     +1.415.626.3939
8  Facsimile:     +1.415.875.5700

9  Attorneys for Plaintiff
   MICRON TECHNOLOGY, INC.

10

11                  **UNITED STATES DISTRICT COURT**

12                 **NORTHERN DISTRICT OF CALIFORNIA**

13

14  MICRON TECHNOLOGY, INC.,                 **Case No. 4:17-CV-06932-JSW**

15              Plaintiff,                    **[PROPOSED] ORDER DENYING**
                                             **DEFENDANT UNITED**
16          v.                               **MICROELECTRONICS**
                                             **CORPORATION'S MOTION TO**
17  UNITED MICROELECTRONICS                  **DISMISS FOR LACK OF PERSONAL**
    CORPORATION, FUJIAN JINHUA               **JURISDICTION**
18  INTEGRATED CIRCUIT CO., LTD., and
    DOES 1-10,
19
                Defendants.
20                                           Judge: Hon. Jeffrey S. White
                                             Courtroom: 5, 2nd Floor
21                                           Hearing date: March 23, 2018
                                             Hearing time: 9:00 a.m.
22
                                             Complaint Filed:  December 5, 2017
23

24

25

26

27

28

Now before the Court for consideration are: (1) Defendant United Microelectronics Corporation's ("UMC") Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion") (Dkt. 27); and (2) the Opposition to the Motion filed by Plaintiff Micron Technology, Inc. ("Micron").

The Court has considered the parties' papers, relevant legal authority, and the record in this case, and the parties appeared for a hearing on March 23, 2018.  For the reasons set forth below, the Court DENIES UMC's Motion.

## BACKGROUND

Except as otherwise indicated, the facts summarized here are drawn from Micron's Complaint and its submissions in connection with the Motion.  For purposes of the Motion, those allegations are assumed true unless the Court indicates differently.

Micron is one of the three global leaders in DRAM technology.  In addition to its manufacturing facilities in the United States, Micron has invested billions of dollars in DRAM operations throughout the world, including its acquisition of Rexchip Electronics, Corp. in Taiwan – a company it renamed "Micron Memory Taiwan Co. Ltd." ("MMT") in 2013.  UMC is a semiconductor foundry whose main business is to manufacture chips based on its customers' designs.  Years before any of the events at issue in this action, UMC is alleged to have discontinued its DRAM business and to have begun specializing as a foundry for logic-process wafers; by 2015, UMC is alleged not to have possessed its own DRAM design manual.

In 2015, Stephen Chen resigned as Site Director for MMT and joined UMC as Senior Vice President.  In January 2016 – within months of Chen's departure from MMT and his hire at UMC – Jinhua negotiated a DRAM technology deal with UMC.  To implement the project, UMC formed a new unit – "New Business Development" ("NBD") – with Chen in charge.

Micron alleges that Chen improperly provided UMC with a "wealth of knowledge on virtually every aspect of MMT's business" (Compl. ¶ 25) and that Chen also recruited other MMT employees, including Kenny Wang and J.T. Ho to provide UMC with Micron trade secrets. Micron alleges that Taiwanese authorities later determined, after search and seizure of their UMC computers, that the men had retained hundreds of Micron trade-secret documents after their departure from MMT so they could use them in their work at UMC.  (*Id.* § IV, p. 4.)  Wang later

1    confessed he had been hired by UMC in March 2018 – even before he left MMT.  In his last days

2    at the company, Wang is alleged to have downloaded hundreds of Micron trade-secret files.

3           Micron presents *prima facie* evidence that, in some of Wang's allegedly improper

4    downloading activity, Wang connected to Micron's servers in Boise and downloaded Micron's

5    files from that Idaho location.  (*See* Declaration of Jon Heller, Micron Cyber Defense Incident

6    Analyst ("Heller Decl.") ¶¶ 6-7.)  Moreover, Micron alleges that, when Wang copied the files for

7    future use, he use the cloud service of Google, which he knew to be headquartered in California

8    and which – according to UMC's own Motion papers – has the majority of its data-storage sites in

9    the United States.  (*See* Litts Decl., Ex. E (Dkt. 28-5.).)  Micron alleges, in sum, that Wang – as an

10   agent of UMC – knowingly aimed his wrongful conduct at the United States and intentionally

11   caused harm there to benefit UMC.  Micron also alleges that UMC thereafter used one or more of

12   the trade-secret documents improperly acquired by Wang to accelerate the development process

13   for its own DRAM chips – specifically the F32 nm and F32S nm products.

14          Micron further alleges that, even with the benefit of information Wang had provided,

15   neither UMC nor Jinhua could ultimately make full use of Micron's secrets without hiring

16   engineers and business people to place the misappropriated technology into mass production.  To

17   recruit the personnel they needed, Micron alleges that UMC and Jinhua sent a joint delegation to

18   an exclusive recruiting event in this District hosted by the Chinese American Semiconductor

19   Professional Association ("CASPA") in October 2016.  (*See* Declaration of Whonchee Lee ("Lee

20   Decl.") ¶ 3 & Ex. 1.)

21          The CASPA event was attended by upwards of 30 guests and was led by representatives of

22   Jinhua and by Stephen Chen for UMC.  (Lee Decl. ¶¶ 4, 9-10.)  Jinhua's representative allegedly

23   unveiled the project timetable and technology roadmap, which reflected that the first DRAM

24   devices slated for manufacture were designated "F32 nm" and "F32S nm" – the same products

25   whose aggressive production schedule allegedly had been made possible by UMC's

26   misappropriation.  Chen is then alleged to have explained that UMC would develop the requisite

27   technology for Jinhua.  Micron alleges that Chen "knew and intended that the recruitment of top

28   talent in Silicon Valley would enable UMC and Jinhua to make optimal use of Micron's trade

secrets in the development and operation of Jinhua's DRAM project." (Compl. ¶ 35.)  At the conclusion of the presentations, Chen and the Jinhua representatives allegedly met with prospective applicants (Lee Decl., ¶ 11), but Micron is currently unaware what they did next or where they travelled.  Based on UMC's own submissions in support of its Motion, it would appear that UMC and Jinhua received résumés at the CASPA event, and that a single UMC HR manager, Jennifer Wang, was in charge of handling the résumés on behalf of both UMC and Jinhua.  (*See* Wang Decl. ¶ 2 (Dkt. 29).)  Micron alleges that it suffered jurisdictionally relevant injury in this District and elsewhere in the United States, including its domicile in Idaho and in Delaware, its place of incorporation.  UMC contends that the alleged contacts with California and the United States are insufficient to support the Court's jurisdiction.

## ANALYSIS

The law governing the Court's personal-jurisdiction analysis is well settled.  It requires a three-part test:

> (1) the non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; *or* perform some act by which he purposefully avails himself of the privileges of conducting activities in the forum, thereby invoking the benefits and protections of its laws; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (emphasis in original; internal citations omitted).  Within this framework, a "purposeful direction" analysis is most often used in tort cases (*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004)) and the Ninth Circuit evaluates "purposeful direction" under a three-part "effects" test.  That test: "[R]equires that the defendant allegedly have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Id.*, at 803 (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  The plaintiff need not have suffered the "brunt" of its harm in the forum.  "If a jurisdictionally sufficient amount of harm is suffered in the forum state, it does not matter that even more harm might have been suffered in another state."  *Yahoo!, Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199, 1207 (9th Cir. 2006) (en banc).

Ordinarily, the Court's due-process analysis considers the defendant's contacts with a particular forum state.  However, if there is no U.S. jurisdiction in which defendant would be amenable to suit, and if the plaintiff's claims arise under federal law, Fed. R. Civ. P. 4(k)(2) provides a federal long-arm statute that allows the plaintiff to rely on the defendant's contacts not only with the forum state but with the United States as a whole; jurisdiction attaches as long as the defendant's aggregate contacts with the United States support personal jurisdiction under constitutional due-process standards.  *Holland America Line Inc. v. Wärtsilä North America, Inc.*, 485 F.3d 450 (9th Cir. 2007).

If the district court does not conduct an evidentiary hearing, the plaintiff need only make a *prima facie* showing of jurisdiction to defeat the defendant's motion and, unless directly controverted, the plaintiff's "version of the facts is taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor. . . .'" *Harris Rutsky*, 328 F.3d at 1129 (quoting *Doe, I v. Unocal Corp.,* 248 F.3d 915, 922 (9th Cir. 2001)).  The burden lies with the plaintiff to show that the defendant purposefully directed its activities at the forum, and that plaintiff's claims relate to those purposeful contacts.  Once that showing is made, the defendant can avoid jurisdiction only by presenting "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 1132 (quoting *Burger King v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

In light of these controlling standards, UMC's jurisdictional challenge is rejected.

**The Court Has Specific Personal Jurisdiction over UMC Because Micron's Claims Arise from and Relate to UMC's Purposeful Contacts with California.**

UMC does not dispute that the acts alleged in Micron's Complaint include purposeful acts aimed at California.  At this stage of the case, Micron is aware of at least one such contact – the joint delegation by UMC and Jinhua to a recruiting event to CASPA in Silicon Valley.  That recruiting mission was obviously purposeful.

UMC's attack on the Court's jurisdiction centers on the second prong of the due-process analysis: UMC asserts that Micron's claims do not "arise out of or relate" to the CASPA event because the CASPA mission was not a "but for" cause of Micron's claims.  (*See* Mot. at 8:14-20

1   (citing *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir. 1995))).  According to UMC: "All of

2   [Micron's] claims would have existed regardless of UMC's single effort to recruit potential

3   employees in this District. . . .  [T]he acts of alleged trade secret theft were completed – in Taiwan

4   – before UMC's contact with California."  *Id.* at 8:22-25 (emphasis omitted).  The Court does not

5   agree with UMC's premise.

6          Taking as true the allegations in Micron's Complaint for purposes of this Motion, and

7   considering the elements of Micron's claim under the Defend Trade Secrets Act, UMC's

8   recruitment efforts were themselves acts of misappropriation and were acts in furtherance of

9   misappropriation.  The statute provides that "[a]n owner of a trade secret that is misappropriated

10  may bring a civil action . . . if the trade secret is related to a product or service used in, or intended

11  for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b).  The law defines

12  "misappropriation" broadly to mean improper "acquisition" of a trade secret (18 U.S.C.

13  § 1839(5)(A)) as well as "disclosure" or "use" of a trade secret, *inter alia*, "by one who used

14  improper means to acquire knowledge of the trade secret."  18 U.S.C. § 1839(5)(B).  The meaning

15  of "use" in the DTSA is substantially identical to the same term in the UTSA.  *See, e.g., Veronica*

16  *Food Co. v. Ecklin*, No. 16-cv-07223-JCS, 2017 WL 2806706 at *12 (N.D. Cal. June 29, 2017)

17  (citing statutes and collecting cases).

18         The UTSA, in turn, defines the kinds of use that can constitute misappropriation broadly:

19  "There are no technical limitations on the nature of the conduct that constitutes 'use' of a trade

20  secret. . . .  As a general matter, any exploitation of the trade secret that is likely to result in injury

21  to the trade secret owner or enrichment to the defendant is a 'use' under this Section."  *JustMed,*

22  *Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) (citing Restatement (Third) of Unfair

23  Competition § 40, cmt. c (1995)).  Importantly, a civil action under the DTSA is available for

24  conduct occurring outside the United States, but only if "an act in furtherance of the offence was

25  committed in the United States."  18 U.S.C. § 1837(2).

26         Here, Micron alleges that its trade secrets have been misappropriated – both by being

27  wrongfully *acquired* (*e.g.*, the improper downloading by Wang and others) and by being

28  wrongfully *used*.  (Compl. ¶¶ 27-29, 31-33.)  And Micron alleges that UMC's actions at the

CASPA recruiting event constituted an improper use of Micron's trade secrets.  *See*, *e.g., Labor Ready, Inc. v. Williams Staffing*, LLC 149 F. Supp. 2d 398, 409-10 (N.D. Ill. 2001) (defendants efforts to recruit personnel through use of plaintiff's trade secrets constituted misappropriation through "use" under the UTSA).  Finally, Micron also alleges that those same recruitment efforts were acts in furtherance of an even more elaborate use of Micron's technology: the full commercialization of the stolen technology.  (Compl. ¶¶ 35-36.)  Because UMC's recruiting efforts were both acts of misappropriation in the United States and U.S.-based acts in furtherance of misappropriation abroad, they are but-for causes of Micron's DTSA claim.  Without U.S.-based conduct in furtherance of the misappropriation, Micron's DTSA claim would not accrue.

UMC attempts to avoid this result by asserting that Micron's claims had already arisen by the time of its Silicon Valley recruitment efforts, and by relying on *Intermedics, Inc. v. Ventritex, Inc.*, 822 F. Supp. 634, 650 (N.D. Cal. 1993) for the proposition that "any subsequent additional acts of misappropriation . . . cannot be considered 'in furtherance' of the alleged conspiracy." (Mot. at 9:4-12.)  The Court believes *Intermedics* is distinguishable.

*Intermedics* is a statute-of-limitations case.  It addresses whether, in the context of a trade-secret misappropriation, each continuing use of the secret triggers a new limitations period. Emphasizing the importance of discouraging stale claims, the court found that a continuing or renewed misappropriation would not restart the clock for limitations purposes (*Id*. at 653).  That ruling is consistent with the text of the DTSA itself.  *See* 18 U.S.C. § 1836(d) ("For purposes of [limitations periods], a continuing misappropriation constitutes a single claim of misappropriation").

The holding of *Intermedics*, however, does not address whether, liability and jurisdiction under the DTSA can arise from improper use of a trade secret long after the trade secret was improperly obtained.  By making any improper use of a stolen trade secret a separate tort, independent of the initial wrongful acquisition, the DTSA does fix liability on acts of misuse that come well after the plaintiff's trade secret was wrongfully obtained.  Hence, courts have consistently held that the DTSA applies even to misappropriations that began prior to the DTSA's enactment, as long as the misappropriation continues to occur after the enactment date and the

1    defendant took some relevant act after the law came into force.  *See Veronica Food Co.*, 2017 WL

2    2806706 at *13 (citing *Brand Energy & Infrastructure Servs., Inc. v. Irex Contracting Grp.*, No.

3    CV 16-2499, 2017 WL 1105648, at *4 (E.D. Pa. Mar. 24, 2017) (collecting district-court decisions

4    nationwide)) and *Cave Consulting Grp., Inc. v. Truven Health Analytics, Inc.*, No. 15-cv-02177-

5    SI, 2017 WL 1436044 at *4 (N.D. Cal. Apr. 24, 2017)).

6         UMC's alleged use of Micron trade secrets while in California – and its alleged acts in

7    furtherance of its continued use – satisfy the "but for" test.  In addition, Micron has sufficiently

8    alleged jurisdictionally relevant injury in California: Micron's Milpitas facility, located in this

9    District, employs roughly 450 professionals including the executive leadership of the company and

10   of the business units that market Micron's DRAM products.  These are the business units most

11   directly harmed by UMC's theft.  *See Yahoo! Inc.*, 433 F.3d at 1207 (jurisdictionally relevant

12   injury need not be plaintiff's only or primary injury); *Dole*, 303 F.3d at 1113 ("We need not

13   choose one criterion as the predominant indicator of where a corporate plaintiff suffers economic

14   injury.  Nor do we need to choose a single forum, for jurisdictionally sufficient harm may be

15   suffered in multiple forums." (internal citations omitted)).

16            **The Court Also Has Personal Jurisdiction over UMC Pursuant to Fed. R.**
             **Civ. P. 4(k)(2).**
17

18        In addition to foregoing, the Court concludes that it may exercise jurisdiction over UMC

19   pursuant to Fed. R. Civ. P. 4(k)(2).  Where, as here, the plaintiff asserts federal claims, Rule

20   4(k)(2) allows the Court to aggregate UMC's California contacts with the contacts it has

21   established with the rest of the country.  In the Ninth Circuit, to prevent the court from applying a

22   Rule 4(k)(2) analysis, the burden lies with the defendant: either it must stipulate that personal

23   jurisdiction would lie in another U.S. jurisdiction, or it concedes that the first prong of the Rule

24   4(k)(2) test is met.  *Holland America*, 485 F.3d at 461 (quoting *ISI Int'l, Inc. v. Borden Ladner

25   Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)).  Here, UMC has not suggested that it would be

26   subject to personal jurisdiction in any state other than California.  Especially when combined with

27   the California contacts, UMC's contacts with the rest of the United States support an exercise of

28   jurisdiction.

1        *First*, Wang – as an alleged agent of UMC – is alleged to have accessed and downloaded

2    Micron's trade secrets directly from the company's servers in Boise.  (Heller Decl. ¶¶ 6-7.)

3    Micron has made a sufficient *prima facie* showing that Wang was aware or should have been

4    aware that he was accessing Micron's servers in Idaho for at least some of the alleged wrongful

5    downloading, but even if he were not actively aware of the servers' location, Wang's alleged

6    downloading from Idaho supports jurisdiction.  *See e.g., Microsoft Corp. v. Mountain W.*

7    *Computers, Inc.*, No. C14-1772RSM, 2015 WL 4479490 (W.D. Wash. July 22, 2015); *Synopsys,*

8    *Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO, 2017 WL 3485881, at *25-26 (N.D. Cal.

9    July 15, 2017); *Summit Entm't, LLC v. Santia*, No. 2:11-cv-06310-ODW(SSx), 2014 WL

10   12577430, at *3 (C.D. Cal. June 24, 2014).

11       *Second*, if the alleged misconduct is proved to have occurred, UMC will have caused

12   Micron considerable harm in Idaho, (Micron's corporate domicile), in California (where the

13   relevant business units are based), and in Delaware (Micron's state of incorporation).  *Dole*, 303

14   F.3d at 1113 (finding that a corporation may suffer harm in multiple jurisdictions, often including

15   its principal place of business).

16       *Third*, UMC committed those concrete DTSA violations in the context of a wider

17   interjection into the United States.  Micron has made a *prima facie* showing that roughly 43

18   percent of UMC's sales come from the United States.  (*See* UMC 4Q2017 Financial Review at 8

19   <<http://www.umc.com/English/pdf/UMC17Q4_financial_presentation-E.pdf.>>)  And there is

20   some evidence that UMC Group (USA) – the wholly owned subsidiary through which UMC

21   makes those sales – also facilitates UMC's recruiting for engineering positions in Taiwan.  Those

22   are the kinds of positions that UMC allegedly needs to fill to make most effective use of the

23   allegedly stolen Micron technology.  In addition, Wang is also alleged to have misappropriated

24   Micron's trade secrets by copying them to his Google cloud account; Google is based in the

25   United States and, as UMC's own filings indicate, the majority of Google's servers are in the

26   United States.  (*See* Litts Decl., Ex. E (Dkt. 28-5.).)  This wealth of contacts further supports the

27   exercise of jurisdiction.

28

[PROPOSED] ORDER DENYING UMC'S MOTION TO DISMISS

1

**UMC Has Not Shown that Jurisdiction Would Be Unreasonable.**

2

Given Micron's showing on the first two prongs of the personal-jurisdiction analysis, UMC

3

bears the heavy burden of showing that the Court's exercise of jurisdiction would nevertheless be

4

unreasonable, based on seven factors – none of which is dispositive.  *Harris Rutsky*, 328 F.3d at

5

1132 (internal citations omitted).  That test does not mandate a simplistic counting up of factors:

6

even when more factors incline away from jurisdiction than toward it, the analysis can be deemed

7

essentially "a wash," and the defendant does not meet its burden.  *Id.* at 1134 (citing *Roth*, 942

8

F.2d at 625.)  *See also Dole*, 303 F.3d at 1117 ("A number of our cases emphasize the heavy

9

burden on both domestic and foreign defendants in proving a 'compelling case' of

10

unreasonableness to defeat jurisdiction.").  "For the Court's exercise of jurisdiction to be

11

unreasonable, the burden of defending in California must be 'so gravely difficult and

12

inconvenient' that it violates due process."  *Enriquez v. Interstate Grp., LLC*, No. 11-CV-05155

13

YGR, 2012 WL 3800801, at *6 (N.D. Cal. Aug. 31, 2012).  As shown below, UMC has not

14

presented a "compelling case" that the Court should decline jurisdiction.

15

**Extent of Defendant's Purposeful Interjection into the Forum**

16

The Ninth Circuit has found this factor favors jurisdiction where twenty-percent of a

17

defendant's business is conducted in a given state, without regard to whether the plaintiff's claim

18

arose out of or was related to all such business.  *Harris Rutsky,* 328 F.3d at 1132 (internal citation

19

omitted).  Here, UMC's interjection into the U.S. market is far more significant.  In addition to

20

making nearly half of its sales from the U.S., UMC has even established a subsidiary here.  And,

21

while a parent-subsidiary relationship alone is insufficient to attribute the contacts of the

22

subsidiary to the parent, it is relevant to show the parent's interjection into the forum.

23

**Burden on Defendant of Defending in the Forum**

24

This factor almost always weighs at least slightly against jurisdiction.  However, the Ninth

25

Circuit has given this factor relatively little weight – particularly where the defendant "frequently

26

travel[s] to California on business."  *Harris Rutsky*, 328 F.3d at 1133-34.  *See also*, *Autodesk, Inc.*

27

*v. Kobayashi + Zedda Architects Ltd.*, 191 F. Supp. 3d 1007, 1019 (N.D. Cal. 2016) (rejecting

28

claim of burden where defendant used technology and transportation to carry on the business and

[PROPOSED] ORDER DENYING UMC'S MOTION TO DISMISS

1   had secured counsel in forum).

2         UMC's burden is even less here, given that UMC Group (USA) is located in this District.

3   *See Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1199 (9th Cir. 1988) (continuing contacts

4   between defendant's U.S.-based agent and California translate into less burden than if defendant

5   maintained no presence or agent in U.S.).  In fact, UMC was recently involved in litigation in this

6   district where it successfully moved for the case to be transferred from the Eastern District of

7   Texas.  In the Texas action, UMC argued that this District was a more convenient forum, and one

8   in which it could be subject to personal jurisdiction.  (*See Lone Star Silicon Innovations, Inc. v.*

9   *United Microelectronics Corp. and UMC Group (USA)*, No. 2:17-cv-04033-WHA (E.D. Tex),

10  Declaration of David H. Huang in Support of Defendant United Microelectronics Corporation's

11  Motion to Transfer, EDS No. 20-7 (4/12/17).)  As UMC explained, "trial in Northern California

12  would be significantly more convenient for UMC Taiwan's potentially relevant employees than in

13  Texas because California is much closer to where those employees reside and work, and because

14  those employees could work at UMC USA's offices in Sunnyvale, California if required to travel

15  to Northern California in connection with [the] lawsuit."  (*Id.* ¶ 13.)

16        **Extent of Conflict with Sovereignty of Defendant's State**

17        "Although this factor is important, it is not controlling." *Harris Rutsky*, 328 F.3d at 1133

18  citing *Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir. 1984) ("If [this factor were]

19  given controlling weight, it would always prevent suit against a foreign national in a United States

20  Court.")  In any case, here the supposed conflict between U.S. jurisdiction and Taiwanese

21  sovereignty appears minimal.  The record indicates that Micron has cooperated with Taiwanese

22  authorities.  (*See, e.g.*, Indictment (Dkt. 1-2) at 9 (referencing evidence provided by Micron

23  witnesses to Taiwanese authorities).)  Micron's suit against UMC and Jinhua appears

24  complementary to the police efforts of Taiwan.

25        **Forum State's Interest in Adjudicating the Dispute**

26        Because Micron grounds the Court's jurisdiction on California's long-arm statute, as well

27  as Rule 4(k)(2), the interests of two different fora must be assessed – California and the United

28  States.  Both have a substantial interest in this dispute.

Contrary to UMC's assertions, California has a significant interest in the case, notwithstanding that Micron is domiciled in Idaho.  California generally, and the Northern District in particular, are home to some of the world's most important semiconductor companies.  Assuming the truth of Micron's allegations, California has a strong interest in preventing any of those companies from buying goods or services potentially tainted by UMC's misappropriation.  *Cf.  Allstar Mktg. Grp., LLC v. Your Store Online, LLC*, 666 F. Supp. 2d 1109, 1125 (C.D. Cal. 2009) (California had interest in adjudicating trademark case to prevent confusion by California consumers).  California also has an interest in preventing competitive harm to Micron's California-based business units.

Applying Rule 4(k)(2), and considering the interests of the United States, the legislative history to the DTSA confirms that Congress viewed it as an important public interest to provide U.S. technology companies a federal, private right of action to defend against misappropriation taking place abroad.  *See* H.R. Rep. No. 114-529 at 3-4 (2016).

### Most Efficient Judicial Resolution of the Controversy

This factor typically turns on which forum will provide the litigants with better access to proof.  "[T]his factor 'is no longer weighed heavily given the modern advances in communication and transportation'" and, for that reason, the Ninth Circuit has sustained the reasonableness of personal jurisdiction even where almost all of the evidence and potential witnesses reside outside the United States.  *See Harris Rutsky*, 328 F.3d at 1133 (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1323 (9th Cir. 1998)).

Here, moreover, it is not clear that all or most of the evidence is in Taiwan.  Much of the most important evidence may be in the United States – including technical details about Micron's technology, the measures the company took to protect its secrets, the forensic evidence of UMC's misappropriation, and the economic damage that UMC's misconduct has caused.  (Myers Decl. ¶ 6.)  Further, whatever the physical location of the documents or witnesses, discovery in Taiwanese civil litigation may not be available.  *See* Chun-Hsien Chen, *Explaining Different Enforcement Rates of Intellectual Property Protection in the United States, Taiwan, and the People's Republic of China*, 10 Tul. J. Tech. & Intell. Prop. 211, 241 (2007).  Accordingly, as a

1   practical matter, proof may be more readily available to both parties in a U.S. litigation.

2   **Forum's Importance to Plaintiff and Existence of an Alternative Forum**

3       The sixth and seventh reasonableness factors counterbalance one another: the importance

4   of the forum to the plaintiff's interest in convenient and effective relief *versus* the possibility that

5   another forum is available.  The Court concludes that while there may exist some alternative

6   forum, that possibility does not outweigh Micron's interest in a having its case tried in a federal

7   forum.  The legislative history to the DTSA evinces Congress's belief that the federal forum and

8   federal cause of action were necessary to provide U.S. companies with effective protection of their

9   trade secrets and redress when those secrets are misappropriated.  *See*  H.R. Rep. No. 114-529 at 6.

10                          **CONCLUSION**

11      For the foregoing reasons, the Court DENIES UMC's Motion in its entirety.  UMC is

12  directed to answer Micron's Complaint not later than _____.

13      IT IS SO ORDERED.

14

15   Dated: _____, 2018.

16

17                                          _____
                                            HON. JEFFREY S. WHITE
                                            United States District Court Judge

18

19

20

21

22

23

24

25

26

27

28  NAI-1503482436

12                                          4:17-CV-06932-JSW

[PROPOSED] ORDER DENYING UMC'S MOTION TO DISMISS

1

**CERTIFICATE OF SERVICE**

2         I hereby certify that a true and correct copy of the above and foregoing documents have

3   been served on March 1, 2018 to all counsel of record who are deemed to have consented to

4   electronic service via the Court's CM/ECF system.

5         Executed on March 1, 2018, at San Diego, California.

6

7                                   By:  *s/ Randall E. Kay*
                                        Randall E. Kay
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATE OF SERVICE