1  Randall E. Kay (State Bar No. 149369)
   rekay@jonesday.com
2  Douglas L. Clark (State Bar No. 279408)
   dlclark@jonesday.com
3  JONES DAY
   4655 Executive Drive, Suite 1500
4  San Diego, CA  92121.3134
   Telephone:   +1.858.314.1200
5  Facsimile:   +1.844.345.3178

6  Patrick T. Michael (State Bar No. 169745)
   pmichael@jonesday.com
7  Marcus S. Quintanilla (State Bar No. 205994)
   mquintanilla@jonesday.com
8  JONES DAY
   555 California Street, Suite 2600
9  San Francisco, CA 94104.1501
   Telephone:   +1.415.626.3939
10 Facsimile:   +1.415.875.5700

11 Attorneys for Plaintiff
   MICRON TECHNOLOGY, INC.

12

13                    **UNITED STATES DISTRICT COURT**

14                   **NORTHERN DISTRICT OF CALIFORNIA**

15

16  MICRON TECHNOLOGY, INC.,            **Case No. 3:17-CV-06932-MMC**

17              Plaintiff,
                                        **PLAINTIFF MICRON TECHNOLOGY,**
18       v.                             **INC.'S OPPOSITION TO DEFENDANT**
                                        **UNITED MICROELECTRONICS**
19  UNITED MICROELECTRONICS             **CORPORATION'S MOTION TO**
    CORPORATION, FUJIAN JINHUA          **DISMISS PLAINTIFF'S FIRST**
20  INTEGRATED CIRCUIT CO., LTD., and   **AMENDED COMPLAINT**
    DOES 1-10,
21                                      Judge:       Hon. Maxine M. Chesney
               Defendants.              Courtroom:   7 – 19th Floor
22                                      Hearing date: March 29, 2019
                                        Hearing time: 9:00 a.m.
23

24                                      First Amended Complaint:  February 8, 2019

25

26

27       **REDACTED VERSION OF DOCUMENT(S) SOUGHT TO BE SEALED**

28

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ........................................................................................ 1

II.     RELEVANT FACTS ................................................................................... 3

        A.      Micron's Claims Arise from UMC's Purposeful Availment to the U.S ................ 3

        B.      Forum Non Conveniens Not Warranted .................................................... 6

III.    LEGAL STANDARD ................................................................................. 7

        A.      Micron's Federal Claims Trigger Rule 4(k)(2) and Require Analysis of
                UMC's Minimum Contacts with the United States as a Whole ....................... 7

        B.      Under the DTSA, Jurisdiction Is Proper Whenever the Defendant Commits
                Any Act (or Act in Furtherance) of Misappropriation in the U.S .................... 8

IV.     UNDER RULE 4(K)(2), UMC'S AGGREGATE CONTACTS WITH THE U.S.
        ESTABLISH PERSONAL JURISDICTION ............................................... 9

        A.      UMC Used Micron's Trade Secrets to Apply for and Obtain U.S. Patents ........... 9

        B.      UMC Led a Delegation of UMC and Jinhua Executives into the U.S. to
                Recruit Semiconductor Engineers ......................................................... 12

        C.      The UMC-Jinhua Delegation Also Enlisted California Equipment
                Suppliers .................................................................................... 12

        D.      UMC Downloaded Micron Trade Secrets from U.S. Servers ......................... 13

                1.      Ho and Wang Accessed and Stole Thousands of Micron
                        Confidential Documents—Many from U.S. Servers ......................... 13

                        a.      Ho Stole 20,000 Micron Technical Documents for UMC ........... 13

                        b.      Wang Accessed U.S. Servers for UMC ............................... 14

                2.      Chen, Ho and Wang All Knew, or Should Have Known, That
                        Confidential Micron Documents Were Downloaded from U.S.
                        Servers ................................................................................ 14

                        a.      The Legal Standard Is Constructive—Not Actual—
                                Knowledge .............................................................. 14

                        b.      Micron Is Headquartered, and Its Primary Operations Are
                                Based, in Boise, Idaho—a Fact Well-Known to Chen, Ho
                                and Wang ................................................................ 15

                        c.      Wang Actually Knew He Was Downloading from U.S.
                                Servers ................................................................... 16

V.      UMC FAILED TO SATISFY THE HIGH BURDEN FOR DISMISSAL BASED
        ON FORUM NON CONVENIENS .......................................................... 17

        A.      Forum Non Conveniens Is Not Warranted ............................................... 17

                1.      Taiwan Is Not an Adequate Forum ............................................ 17

                2.      The Private and Public Interest Factors Weigh Against Dismissal ........... 18

        B.      Employment Agreements with Non-Parties Cannot Suffice to Support
                Forum Non Conveniens ................................................................... 22

VI.     CONCLUSION ...................................................................................... 25

# <u>TABLE OF AUTHORITIES</u>

**Page**

CASES

*Altavion, Inc. v. Konica Minolta Sys. Lab. Inc.*,
   226 Cal. App. 4th 26 (2014) ......................................................................9

*Am. Wave Machines, Inc. v. Surf Lagoons, Inc.*,
   No. 13-CV-3204-CAB NLS, 2014 WL 10475281 (S.D. Cal. Nov. 12, 2014) .................10, 11

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*,
   874 F.3d 1064 (9th Cir. 2017), ....................................................................7

*Basic Fun, Inc. v. POP Mktg. Grp., Inc.*,
   No. CIV.A. 06-1129, 2006 WL 1648982 (E.D. Pa. June 12, 2006) .........................................23

*Bazuaye v. I.N.S.*,
   79 F.3d 118 (9th Cir. 1996) ........................................................................9

*Boston Telecomms. Grp., Inc. v. Wood*,
   588 F.3d 1201 (9th Cir. 2009) ........................................................................18, 20

*Burger King Corp. v. Rudzewicz*,
   471 U.S. 462 (1985) ........................................................................9, 13

*Chloe Z Fishing Co Inc. v Odyssey Re (London) Ltd.*,
   109 F. Supp. 2d 1236 (S.D. Cal. 2000) ..............................................................24

*Concat LP v Unilever PLC*,
   350 F. Supp. 2d 796 (N.D. Cal. 2004) ..............................................................24

*Condos v. Condos*,
   No. CV 04-07365 DT, 2006 WL 8431432 (C.D. Cal. Feb. 9, 2006)....................................20

*Cooper v. Tokyo Elec. Power Co., Inc.*,
   166 F. Supp. 3d 1103 (S.D. Cal. 2015), aff'd, 860 F.3d 1193 (9th Cir. 2017) .......................20

*Cray Inc. v. Raytheon Co.*,
   179 F. Supp. 3d 977 (W.D. Wash. 2016) .........................................................9

*CYBERsitter, LLC v. People's Republic of China*,
   No. CV 10-38-JST SHX, 2010 WL 4909958 (C.D. Cal. Nov. 18, 2010) ..........................20, 21

*DEX Sys., Inc. v. Deutsche Post AG*,
 727 F. App'x 276 (9th Cir. 2018) ................................................................7

*Docksider, Ltd. v. Sea Tech., Ltd.*,
 875 F.2d 762 (9th Cir. 1989).....................................................................22

*Doe, I v. Unocal Corp.*,
 248 F.3d 915, 922 (9th Cir. 2001)................................................................8

*Dole Food Co. v. Watts*,
 303 F.3d 1104 (9th Cir. 2002)...............................................8, 17, 18, 22

*Fireman's Fund Ins. Co. v. M.V. DSR Atl.*,
 131 F.3d 1336 (9th Cir. 1997).....................................................................22

*Gates Learjet Corp. v. Jensen*,
 743 F.2d 1325 (9th Cir. 1984).....................................................................21

*Grabhorn v. HSBC Bank USA*,
 No. CV 12-8540-GHK (SHX), 2013 WL 12130011 (C.D. Cal. Jan. 10, 2013) ......................24

*Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*,
 328 F.3d 1122 (9th Cir. 2003).......................................................................8

*Holland Am. Line Inc. v. Wärtsilä N. Am.*,
 485 F.3d 450 (9th Cir. 2007)........................................................................7

*Hunt Wesson Foods, Inc. v. Supreme Oil Co.*,
 817 F.2d 75 (9th Cir. 1987)...................................................................22, 23

*In re Air Crash Over Taiwan Straits on May 25, 2002*,
 331 F. Supp. 2d 1176 (C.D. Cal. 2004) ...............................................21, 22

*Informatics Applications Grp., Inc. v. Shkolnikov*,
 836 F. Supp. 2d 400 (E.D. Va. 2011)..........................................................9, 11

*JustMed, Inc. v. Byce*,
 600 F.3d 1118 (9th Cir. 2010).......................................................................8

*Labor Ready, Inc. v. Williams Staffing, LLC*,
 149 F. Supp. 2d 398 (N.D. Ill. 2001) .........................................................12

*Lismont v. Alexander Binzel Corp.*,
 No. 2:12CV592, 2013 WL 6095461 (E.D. Va. Nov. 18, 2013) ...............................10

*MacDermid, Inc. v. Deiter*,
   702 F.3d 725 (2d Cir. 2012)..................................................................................15

*Manetti-Farrow, Inc. v. Gucci America, Inc.*,
   858 F.2d 509 (9th Cir. 1988)..........................................................................24, 25

*Manu Int'l., S.A. v. Avon Prods, Inc.*,
   641 F.2d 62 (2d Cir. 1981)...................................................................................19

*Microsoft Corp. v. Mountain West Computers, Inc.*,
   No. C14-1772 RSM, 2015 WL 4479400 (W.D. Wash. July 22, 2015)...................14

*Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co.*,
   No. C 06-7541 PJH, 2007 WL 2403395 (N.D. Cal. Aug. 20, 2007).......................19

*Mitsubishi Motors Corp v Soler Chrysler-Plymouth Inc.*,
   473 U.S. 614 (1985)......................................................................................24, 25

*Nibirutech Ltd. v. Jang*,
   75 F.Supp. 3d 1076 (N.D. Cal. 2014) ...................................................................17

*Prograph Intern Inc v Barhydt*,
   928 F. Supp. 983 (N.D. Cal. 1996) ......................................................................24

*Rare Breed Distilling v. Heaven Hill Distilleries*,
   No. C-09-04728 EDL, 2010 WL 335658 (N.D. Cal. Jan. 22, 2010) .......................19

*Repap Enters. Inc. v. Kamyr Inc.*,
   No. 92-5701, 1993 WL 322881 (E.D. Pa. June 8, 1993)..........................................9

*Ruehl v. AM Gen. LLC*,
   No. 10-C-182, 2010 WL 2720758 (E.D. Wis. Jul. 2, 2010) ....................................23

*Simula, Inc. v. Autoliv, Inc.*,
   175 F.3d 716 (9th Cir. 1999).................................................................................24

*Summit Entm't, LLC v. Santia*,
   No. 2:11-cv-06310-ODW(SSx), 2014 WL 12577430 (C.D. Cal. June 24, 2014)...................15

*Synopsys, Inc. v. Ubiquiti Networks, Inc.*,
   No. 17-cv-00561-WHO, 2017 WL 3485881 (N.D. Cal. July 15, 2017)............................14, 16

*Synthes (U.S.A.) v. G.M. Dos Reis Jr. Ind. Com de Equip. Medico*,
   563 F.3d 1285 (Fed. Cir. 2009)............................................................................13

*Synthes, Inc. v. Emerge Med., Inc.*,
  887 F. Supp. 2d 598 (E.D. Pa. 2012) ..................................................................24

*Talatala v. Nippon Yusen Kaisha Corp.*,
  974 F. Supp. 1321 (D. Haw. 1997) ....................................................................22

*Touchcom, Inc. v. Bereskin & Parr*,
  574 F.3d 1403 (Fed. Cir. 2009)....................................................................10, 11

*Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.*,
  108 F. Supp. 3d 816 (N.D. Cal. 2015) ...............................................................25

*VBConversions LLC v. Buildertrend Sols., Inc.*,
  No. 2:17-cv-02266-CAS(JEMx), 2017 WL 2469969 (C.D. Cal. Jun. 5, 2017) .....................23

*Veronica Foods Co. v. Ecklin*,
  No. 16-cv-07223-JCS, 2017 WL 2806706 (N.D. Cal. June 29, 2017) ........................8

*Wood v. World Wide Ass'n of Specialty Progs. & Sch., Inc.*,
  No. 2:06-CV-708 TS, 2007 WL 2821768 (D. Utah Sept. 27, 2007) ........................23

STATUTES

18 U.S.C. § 1837(2) .....................................................................................8

18 U.S.C. § 1839(5) .....................................................................................8

California's Uniform Trade Secrets Act ................................................3. 7, 20, 21

Defend Trade Secrets Act .......................................................................... passim

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c) (d) ................... passim

Uniform Trade Secrets Act ..............................................................................8

OTHER AUTHORITIES

Federal Rule of Civil Procedure 4(k)(2) .......................................................... passim

H.R. Rep. No. 114-529 ...............................................................................8, 21

1

## I.    INTRODUCTION

2          As the sole major manufacturer of DRAM in the U.S. with significant operations in

3   California, Micron Technology, Inc. ("Micron") is one of the world's three leading producers of

4   dynamic random access memory ("DRAM") chips.  That status has made Micron a target of

5   China's efforts to acquire advanced technologies from the U.S. semiconductor industry[1] and a

6   scheme of foreign commercial espionage that has made international headlines.[2]

7          On December 5, 2017, Micron filed suit against United Microelectronics Corporation

8   ("UMC") and Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") for trade secret

9   misappropriation, RICO and conspiracy.  (Dkt. 1.)  Approximately a year ago on February 15,

10  2018, UMC filed a motion to dismiss for lack of personal jurisdiction.  (Dkt. 27.)  After the

11  motion was briefed, the Court authorized jurisdictional discovery to delve further into: (i)

12  recruitment activities in this District and (ii) knowledge by UMC (or its agents) as to server

13  locations from which trade secrets were stolen.  (Dkt. 53.)  At approximately the same time,

14  patents assigned to UMC and Jinhua, related to DRAM and containing Micron trade secrets

15  ("UMC/Jinhua Patent Filings") started publishing.  Micron alleged these new acts of trade secret

16  misappropriation in its supplemental opposition briefing.  (Dkt. 75-3.)  On October 2, 2018,

17  Jinhua moved to dismiss and Micron opposed based in part on the UMC/Jinhua Patent Filings.

18  (Dkts. 106, 116.)  On January 18, 2019, the Court granted Jinhua's motion to dismiss with leave

19  for Micron to amend its complaint.  (Dkt. 139.)  In its Order, the Court recognized that while

20  Micron provided evidence of purposeful availment based off the patent filings, it had not made

21  these allegations in its complaint.  (*Id.* at 4:10-23.)  The Court made similar findings with regards

22  to meetings with equipment vendors and recruiting efforts in this District.  (*Id.* at 5:1-6:10.)

23          In response, Micron filed its First Amended Complaint dated February 8, 2019 ("FAC")

24  (dkts. 140-3, 156), following the Court's guidance.  (*See* Dkt. 139.)  In its FAC, Micron alleged

25  facts of UMC's misappropriation of thousands of Micron's trade secrets, (FAC ¶¶ 4, 22, 47, 72,

26

27  [1] Comm'n on Theft of Am. Intellectual Prop., Update to the IP Commission Report, at 15 (Feb. 2017), *available at* http://ipcommission.org/report/IP_Commission_Report_Update_2017.pdf.
    [2] New York Times, "Inside a Heist of American Chip Designs, as China Bids for Tech Power"

28  (June 22, 2018), *available at* https://www.nytimes.com/2018/06/22/technology/china-micron-chips-theft.html.

74), through both the knowing downloads from U.S. servers of trade secrets (*id.* ¶¶ 47-51) and the 117 UMC/Jinhua Patent Filings, which all constitute acts of misappropriation (*id.* ¶¶ 4). In addition, UMC engaged in acts of furtherance of its misappropriation by recruiting engineers and meeting /purchasing equipment from vendors in this District. (*Id.* ¶¶ 23-45, 83-84.)

*First,* UMC not only stole trade secrets from Micron, but it exploited those trade secrets by filing for and obtaining over a hundred patents in the U.S. J.T. Ho—an UMC employee— alone stole more than 20,000 confidential Micron files and is an inventor on 25 of the UMC/Jinhua Patent Filings. The UMC/Jinhua Patent Filings are themselves a misappropriation of trade secrets as they *use and disclose* Micron's trade secrets in the U.S.

*Second,* UMC's October 2016 recruiting activities at the Chinese American Semi-conductor Professional Association ("CASPA") in this District involved far more than merely attending a job fair. Armed with Micron's trade secrets, UMC organized and led a delegation of seven UMC and Jinhua executives specifically targeted at recruiting talented U.S. engineers for— and partnering with top U.S. semiconductor equipment suppliers on—the UMC/Jinhua DRAM project. The delegation met with approximately 60-80 U.S. engineers at the CASPA event alone, and in the following days met with Lam Research, Applied Materials, and KLA-Tencor—some of the largest semiconductor equipment suppliers in the U.S.

*Third*, forensic analysis reveals that Kenny Wang accessed or downloaded over 1,200 confidential Micron files on behalf of UMC. And Wang's co-conspirator, Ho—another Micron engineer hired by UMC—admitted under oath to stealing more than 20,000 confidential Micron files for UMC's benefit. Forensic analysis not only confirms that many files came from Micron's Boise servers, it establishes that Wang must have known he was accessing Boise servers at least because he requested access to a "New Boise Linux Account"—after agreeing to join UMC.

Finally—UMC for the first time since the original complaint on December 5, 2017—has raised the issue of forum non conveniens, relying almost exclusively on employment agreements of non-parties that contain a *permissive* jurisdictional clause. Because the clause is permissive, it has no bearing on this case. Further, this case does not raise any contract disputes under those agreements, and none of the signatories to those agreements are parties to this case. Moreover,

1   UMC has the burden to prove forum non conveniens, but it has failed to analyze any of the

2   relevant factors or prove that Taiwan would provide an adequate forum.

3       UMC's purposeful misconduct is directed at the U.S., which is also the proper forum.

4   UMC's motion to dismiss, (Dkt. 160-1 ("Motion")), should be denied.

5   **II.    RELEVANT FACTS**

6       **A.    Micron's Claims Arise from UMC's Purposeful Availment to the U.S.**

7       Micron is one of the three global leaders in DRAM technology.  In addition to its

8   manufacturing facilities in the U.S., Micron has invested billions of dollars in DRAM operations

9   throughout the world, including its acquisition of Rexchip Electronics Corp. in Taiwan—a

10  company it renamed "Micron Memory Taiwan Co. Ltd." ("Micron-Taiwan") in 2013.  (Dkt. 157-

11  2 ("Taiwanese Indictment") § I, at 2.)  UMC is a semiconductor foundry whose main business is

12  to manufacture chips based on customers' designs.  (FAC ¶ 2.)  Although UMC is one of the

13  largest semiconductor fabricators in the world, it had no DRAM technology until it began

14  misappropriating Micron's trade secrets.  (Taiwanese Indictment §§ II, at 2-3 & V, at 6.)

15      Starting at least as early as September, 2015, (*id.* § II, at 3), UMC began to acquire

16  Micron's personnel, and it began to acquire, use and disclose Micron's trade secrets in violation

17  of the Defend Trade Secrets Act ("DTSA"), California's Uniform Trade Secrets Act ("CUTSA"),

18  and Racketeer Influenced and Corrupt organizations Act ("RICO") civil provisions.

19      In 2015—with a "wealth of knowledge on virtually every aspect of Micron-Taiwan's

20  business" (FAC ¶ 69)—Stephen Chen resigned as Micron-Taiwan's Site Director and UMC hired

21  him as Senior Vice President.  (Taiwan Indict. § II, at 3.)  In January 2016—within months of

22  UMC hiring Chen (and despite UMC's lack of background in DRAM technology)—UMC

23  negotiated a DRAM technology deal with Jinhua, agreeing to provide Jinhua with DRAM

24  technology to enable Jinhua to become a leading force in the DRAM business (the "UMC/Jinhua

25  DRAM Project").  (FAC ¶ 2.)  In exchange for the promised technology transfer, Jinhua agreed to

26  provide UMC with $300 million in equipment, $400 million in development fees, and 50 percent

27  ownership of the technology.  (Taiwan Indict. § II, at 2-3.)  To implement the project, UMC

28  formed the "New Business Development" with Chen in charge.  (*Id.* § II, at 3.)

Chen also recruited other Micron-Taiwan employees, including Wang and Ho, (*id.* §§ III & IV, at 3-5), and on February 7, 2017, Taiwanese authorities raided UMC.  (FAC ¶ 3.)  From this raid the Taiwanese authorities discovered that former Micron employees retained hundreds of Micron trade-secret documents after their departure from Micron-Taiwan for use at UMC.  (Taiwan Indict. §§ III & IV, at 3-5.)  Despite Chen's involvement, or perhaps because of that involvement, two weeks after these raids, he became Jinhua's President.  (*See* FAC ¶¶ 3, 87.)

One of Chen's recruits, Ho, testifying on behalf of UMC, admitted to the possession and theft of Micron technology, including over 20,000 confidential Micron files.  (*See* FAC ¶¶ 54-58.)  Wang, another recruit, also had Micron technology.  Wang confessed (Taiwan Indict. § VII, at 8), that he had been hired by UMC in March 2016, before he left Micron-Taiwan, and in his last days at the company he downloaded Micron information.  (*Id.* § IV, at 5.)  Micron determined that Wang performed improper downloading activity by remote connections to Micron's Boise, Idaho servers, and he download Micron's files from that location.  (FAC ¶ 47.)  Wang downloaded over 1,200 Micron technical files—mostly during his last days at Micron-Taiwan.  *Id.*  Of those files, Micron confirmed that at least 174 were accessed or downloaded from Micron's SharePoint system, exclusively on U.S. servers.  *Id.*  Wang knew they were U.S. servers when he accessed and stole documents.  (FAC ¶¶ 48-51.)  In sum, Wang—as UMC's agent—knowingly aimed his wrongful conduct at the U.S., intentionally causing harm to Micron.

But UMC did not stop at *acquiring* Micron trade secrets; it took almost immediate steps to *use* them in its own operations.  (FAC ¶ 80.)  To make full use of Micron's secrets, Jinhua and UMC would need to hire engineers and procure equipment to mass produce the misappropriated technology.  In June 2016, Jinhua posted material on the U.S.-based organization CASPA's website advertising numerous job openings in a variety of DRAM positions, including process and design R&D, manufacturing, DRAM yield and process optimization, and DRAM testing.  (*Id.*)  In October 2016, UMC's Chen led a delegation of seven UMC and Jinhua executives to an exclusive recruiting event hosted by CASPA in Silicon Valley.  (*Id.*)  To promote the project, UMC helped arrange for Jinhua to be a sponsor and to deliver a presentation touting defendants' plans for mass DRAM production in China.  (FAC ¶¶ 27, 80-81.)  UMC's Chen contributed to

1    Jinhua's presentation, providing a technology-transfer roadmap and fielding questions from

2    prospective hires.  (FAC ¶ 80.)  UMC and Jinhua actively recruited potential hires—highly

3    skilled DRAM engineers—relying on Micron's stolen technology.  (FAC ¶¶ 24-27.)

4          Approximately 60-80 engineers attended the CASPA event, and UMC interviewed

5    roughly 20 of them, many residing in Northern California.[3]  (*Id.*)  During the recruiting

6    presentation, Jinhua unveiled the project timetable and technology roadmap, reflecting the first

7    DRAM devices slated for manufacture designated as "F32" and "F32S"[4]—with an aggressive

8    production schedule made possible by UMC's misappropriation.  (*Id.*; Taiwan Indict. § V, at 5-7.)

9    As stated in the FAC: "This ambitious roadmap, which would tend to assuage any concerns of job

10   candidates that the project was distant or speculative, would not be possible without the use of the

11   stolen Micron trade secrets."  (FAC ¶ 81.)  Chen "intended that the recruitment of top talent in

12   Silicon Valley would enable UMC and Jinhua to make optimal use of Micron's trade secrets in

13   the development and operation of Jinhua's DRAM project."  (FAC ¶ 80.)

14         While in this District, the delegation spent several days visiting leading suppliers of

15   semiconductor equipment, including Applied Materials, KLA-Tencor, and Lam Research.  (FAC

16   ¶ 38.)  In these meetings, Jinhua made presentations and UMC participated as Jinhua's technical

17   partner.  (*Id.*)  Moreover, the UMC/Jinhua DRAM Project had, in fact, ███ placed orders for

18   DRAM manufacturing equipment, vendors had performed tool work for the project, and UMC

19   used equipment from these vendors.  (FAC ¶¶ 42-44.)  ████████████████████████

20   ████████████████████████████████████████████████████  (FAC

21   ¶ 45.)  Jinhua purchased equipment from those vendors for UMC's use. (FAC ¶ 42.)  For each of

22   the vendors, UMC's contacts in this District contributed to the sale and export of the very

23   equipment UMC would use to fully exploit Micron's stolen DRAM technology.

24         UMC and Jinhua did not stop there; they immediately began jointly seeking patents in the

25   United States.  An analysis of the UMC/Jinhua Patent Filings establish that both Jinhua and UMC

26   _____

27   [3] UMC only produced six job applications arising from these interviews, but each of the
     candidates lived or appear to currently live in this District.  (*Id.*)

28   [4] Tellingly, the very names "F32" and "F32S" were unique, internal product code names
     used by Elpida (later acquired by Micron and licensed to Micron Taiwan).  (FAC ¶ 81.)

were and still are actively *using* and *disclosing* Micron's trade secrets by filing and obtaining

intellectual property rights *in the United States*, which constitutes an act of misappropriation and

acts in furtherance of their misappropriation in the U.S. and in this District.  (FAC ¶¶ 4, 93, 95.)

As of the filing of its FAC, Micron determined there were at least 117 UMC/Jinhua Patent Filings, all of which were filed *after* defendants stole and possessed Micron's trade secrets.  (FAC ¶ 93.)  The vast majority of the filings name former Micron engineers as inventors, including for example, co-conspirator Ho (inventor on at least 25 patent filings), co-conspirator Wang (inventor on at least 5 patent filings) and Neil Lee (inventor on at least 33 patent filings).  (FAC ¶ 94.)  Since Micron filed its FAC, however, the number of UMC/Jinhua Patent Filings keeps rising— Micron has determined that  there are currently at least 132 UMC/Jinhua Patent Filings.  (Declaration of Dr. David Liu ("Liu Decl.") ¶ 5).[5]  Indeed, of the 132 UMC/Jinhua Patent Filings now known to exist, former Micron employees are named inventors on as many as 120 of the filings.  (*See id.* Ex. 2.)  Many of these UMC/Jinhua Patent Filings are based on and derived from Micron's stolen trade secrets.  (FAC ¶¶ 4, 93, 95.)

Through their trade secret misappropriation scheme, UMC has caused Micron considerable harm in California where Micron maintains a facility in Milpitas—in this District— which employs roughly 450 professionals including the executive leadership of the company and business units that market Micron's DRAM products.  (FAC ¶¶ 9, 62.)  Additionally, Micron is harmed in Boise, Idaho (Micron's corporate domicile), and elsewhere in the United States.  *Id.*

### B.   Forum Non Conveniens Not Warranted.

For the first time since this case began on December 5, 2017, UMC claims that this case should be dismissed on forum non conveniens.  UMC's main argument is that non-parties to this litigation have signed employment agreements with Micron-Taiwan, indicating that litigation with those employees arising out of the employment agreement should be handled in Taichung District Court in Taiwan.  (Dkts. 160-3, 160-4 ¶ 18.)  These employment agreements state that

---

[5] These additional facts in Dr. Liu's declaration are not required for the Court to deny this motion, but are included merely to demonstrate that UMC and Jinhua are not stopping their on-going acts of misappropriation through a continuing stream of patent filings.  For finding personal jurisdiction, even one patent filing should suffice.  Here, there are currently 132 filings.

1  any dispute related to the agreements "shall be settled by the parties," and for litigation, that "the

2  parties agree" to jurisdiction of the Taichung District Court.  (*Id.*)  None of the employees,

3  however, are parties to this lawsuit.  (*See* FAC.)  Further, this is not a case for breach of contract,

4  but rather this case was brought under federal and California statutes, namely, the DTSA, CUTSA

5  and RICO.  (*See* FAC.)

6  **III.    LEGAL STANDARD**

7           **A.    Micron's Federal Claims Trigger Rule 4(k)(2) and Require Analysis of
                UMC's Minimum Contacts with the United States as a Whole.**

8

9          UMC is subject to the Court's specific personal jurisdiction if: (1) UMC purposefully

10  directed its activities at the forum; (2) Micron's claims relate to UMC's forum-related activities;

11  and (3) the exercise of jurisdiction comports with fair play and substantial justice.  *See DEX Sys.,*

12  *Inc. v. Deutsche Post AG*, 727 F. App'x 276, 277 (9th Cir. 2018) (citing *Axiom Foods, Inc. v.*

13  *Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068-69 (9th Cir. 2017)).  Under that standard, "purposeful

14  direction" requires that the defendant allegedly have "(1) committed an intentional act, (2)

15  expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be

16  suffered in the forum state."  *Id.* (Quotations omitted.)

17         Because Micron asserts federal claims under the DTSA and Civil RICO, Federal Rule of

18  Civil Procedure 4(k)(2) expands the focus of the Court's minimum-contacts analysis.  Where, as

19  here, the defendant identifies no U.S. state in which it would be amenable to suit, Rule 4(k)(2)

20  provides a federal long-arm statute that allows the plaintiff to rely on the defendant's contacts not

21  only with the forum state, but with the U.S. as a whole.  *See Holland Am. Line Inc. v. Wärtsilä N.*

22  *Am.,* 485 F.3d 450, 461-62 (9th Cir. 2007) (holding where plaintiff alleges federal claim and

23  defendant does not identify a state in which it would be subject to jurisdiction, court may consider

24  defendant's "contacts with the nation as a whole").  Under Rule 4(k)(2), jurisdiction attaches as

25  long as the defendant's aggregate contacts with the U.S. support personal jurisdiction.  *Id.* at 461.[6]

26         Thus, personal jurisdiction over UMC is proper if UMC expressly aimed intentional acts

27

28  [6] To escape the application of Rule 4(k)(2), the defendant must stipulate that personal jurisdiction
    would be proper in another U.S. district court.  (*Id.*)  UMC has not done so.

1  at the U.S. and caused Micron injury here.  Because Micron is headquartered in Idaho, owns all of

2  the stolen trade secrets, and conducts R&D activities there, its injuries have clearly been felt in

3  the U.S.  *See Dole Food Co. v. Watts*, 303 F.3d 1104, 1113 (9th Cir. 2002) (noting that

4  "corporation can suffer economic harm both where the bad acts occurred and where the

5  corporation has its principal place of business").  The crucial inquiry is whether UMC expressly

6  aimed its misconduct here.  As shown below, it did.[7]

7

     **B.**     **Under the DTSA, Jurisdiction Is Proper Whenever the Defendant Commits Any Act (or Act in Furtherance) of Misappropriation in the U.S.**

8

9       Applied to Micron's claim under the DTSA, Rule 4(k)(2) subjects UMC to the Court's

10  jurisdiction if it committed some act of misappropriation—or "an act in furtherance of" its

11  misappropriation—in the U.S.  18 U.S.C. § 1837(2).  That broad mandate is essential to the Act's

12  objective of combatting international commercial espionage.  The DTSA was Congress's answer

13  to the "significant and growing threat presented by criminals who engage in espionage on behalf

14  of foreign adversaries and competitors."  H.R. Rep. No. 114-529 at 3-4 (2016).  Congress

15  believed that the DTSA—with its international reach—was critical to the protection of U.S. trade

16  secrets against theft from abroad.  *Id.* at 6.

17       Consistent with its mandate, the DTSA adopts the broad definition of misappropriation

18  found in the Uniform Trade Secrets Act.  *See, e.g., Veronica Foods Co. v. Ecklin*, No. 16-cv-

19  07223-JCS, 2017 WL 2806706, at *12-13 (N.D. Cal. June 29, 2017).  "Misappropriation" means

20  any improper "acquisition" of a trade secret, as well as "disclosure" or "use" of a trade secret,

21  inter alia, "by [one] who used improper means to acquire knowledge of the trade secret."  18

22  U.S.C. § 1839(5)(A)-(B).  "There are no technical limitations on the nature of the conduct that

23  constitutes 'use' of a trade secret. . . .  [A]ny exploitation of the trade secret that is likely to result

24  in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section."

25  *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) (citation omitted).

26

27  [7] Unless directly controverted, Micron's "version of the facts is taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [plaintiff's] favor. . . .'"
28  *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1129 (9th Cir. 2003) (quoting *Doe, I v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001)).

1    As shown below, UMC knowingly committed repeated acts of misappropriation—and

2    acts in furtherance thereof—throughout the U.S.  Jurisdiction over UMC is fair and reasonable.[8]

3    **IV.    UNDER RULE 4(K)(2), UMC'S AGGREGATE CONTACTS WITH THE U.S.**
      **ESTABLISH PERSONAL JURISDICTION.**

4

5    UMC's contacts with the U.S. establish personal jurisdiction under Rule 4(k)(2).  First,

6    UMC and Jinhua have been filing U.S. patent applications incorporating Micron's stolen trade

7    secrets at an alarming rate.  (FAC ¶¶ 4, 92-98.)  Second, UMC and Jinhua sent a large delegation

8    to this District seeking to recruit DRAM-experienced engineers in furtherance of its trade secret

9    misappropriation.  (FAC ¶¶ 23-36, 82.)  Third, UMC and Jinhua interviewed, conducted meetings

10   with, and purchased equipment from three major equipment vendors located in this District.

11   (FAC ¶¶ 37-45, 83-84.)  Fourth, forensic analysis has verified that UMC's downloads of Micron

12   technology came directly from U.S. servers and that the employees knew or should have known

13   the U.S. source of those downloads.  (FAC ¶¶ 16, 47-51, 55.)  Finally, Micron has been harmed in

14   this District, as well as elsewhere in the U.S.  (FAC ¶¶ 62, 126, 134, 141.)

15   **A.    UMC Used Micron's Trade Secrets to Apply for and Obtain U.S. Patents**

16   UMC has purposefully directed its misconduct at the U.S. by seeking and obtaining U.S.

17   patents based on Micron's stolen technology.  Micron's trade secret claims arise from many of

18   the UMC/Jinhua Patent Filings.  The filing of a U.S. patent application based on another's trade

19   secrets is an act of misappropriation in the U.S.  *See Informatics Applications Grp., Inc. v.*

20   *Shkolnikov*, 836 F. Supp. 2d 400, 423 (E.D. Va. 2011); *accord Repap Enters. Inc. v. Kamyr Inc.*,

21   No. 92-5701, 1993 WL 322881, at *8 (E.D. Pa. June 8, 1993) (defendant misappropriated

22   plaintiff's trade secrets by including them in patent applications); *Altavion, Inc. v. Konica Minolta*

23   *Sys. Lab. Inc.*, 226 Cal. App. 4th 26, 65-66 (2014) (when defendant files patent applications based

24   on plaintiff's trade secrets, it is a classic violation of trade secret law).

25   ───────────────

[8] UMC does not address any reasonableness factors in its opening brief, and cannot raise it for the
26   first time in its reply brief.  *Cray Inc. v. Raytheon Co.*, 179 F. Supp. 3d 977, 989 (W.D. Wash.
      2016) ("Raytheon fails to address any other reasonableness factors in its opening brief, and the
27   court does not consider arguments raised for the first time in Raytheon's reply brief.") (citing
      *Bazuaye v. I.N.S.*, 79 F.3d 118, 120 (9th Cir. 1996).)  The burden belongs to UMC to show that
28   this jurisdiction is unreasonable, which it has failed to do.  *Burger King Corp. v. Rudzewicz*, 471
      U.S. 462, 476-78 (1985).

In addition, "[t]he Federal Circuit has determined that the filing of a patent application . . . is a 'purposeful' activity directed at 'parties in the United States,' and is sufficient to establish 'minimum contacts' with the United States and 'satisfy due process.'" *Lismont v. Alexander Binzel Corp.*, No. 2:12CV592, 2013 WL 6095461, at *7 (E.D. Va. Nov. 18, 2013) (quoting *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1416 (Fed. Cir. 2009)). "Accordingly, the filing of the U.S. patent application in this case qualifies as a 'purposefully directed' activity toward, and a 'minimum contact' with, the United States." *Id.* Here, UMC purposefully directed activity to the U.S. through its at least 117 UMC/Jinhua Patent Filings. (FAC ¶¶ 4, 92.)

As important, Micron's claim for trade secret misappropriation arises out of and directly relates to these UMC/Jinhua Patent Filings. *See Touchcom, Inc.*, 574 F.3d at 1416-17; *see also Am. Wave Machines, Inc. v. Surf Lagoons, Inc.*, No. 13-CV-3204-CAB NLS, 2014 WL 10475281, at *8 (S.D. Cal. Nov. 12, 2014). Starting in September 2016, and publishing in late 2017, UMC and Jinhua have been applying for and obtaining patents based on Micron's trade secrets. (FAC ¶ 92.) All of these were filed *after* UMC stole and had possession of Micron's trade secrets.[9] (FAC ¶ 93.) Many of the UMC/Jinhua Patent Filings describe technologies from Micron's stolen trade secrets. (*Id.*) Given the short period of time from when UMC and Jinhua commenced working on the UMC/Jinhua DRAM Project and the priority dates of the UMC/Jinhua Patent Filings, Micron pleads on information and belief that the Defendants did not and could not have independently developed the DRAM in the UMC/Jinhua Patent Filings. (*Id.*)

Additionally, the vast majority of the UMC/Jinhua Patent Filings name former Micron engineers as inventors, including for example, co-conspirator Ho (inventor on at least 25 UMC/Jinhua Patent Filings), co-conspirator Wang (inventor on at least 5) and Neil Lee (named inventor on at least 33). (FAC ¶¶ 4, 16-17, 94.) As of the filing of the FAC, former Micron employees were named inventors on as many as 110 of the 117 UMC/Jinhua Patent Filings— almost 95%. (FAC ¶ 94.) Every one of the UMC/Jinhua Patent Filings would constitute yet

---

[9] From the moment UMC started work on the DRAM Project through the priority dates of each of its U.S. patents and applications, UMC was in possession of the more than 20,000 files that Ho had stolen from Micron. (FAC ¶¶ 16, 54.) UMC was also in possession of those files downloaded by Wang, including many from U.S. servers. (FAC ¶ 47.)

another use and disclosure of a trade secret.  (FAC ¶¶ 4, 95.)  Micron's claim for trade secret misappropriation arises out of and relates to the UMC/Jinhua Patent Filings, because the filings constitute the improper use and disclosure of Micron's trade secrets.  *Informatics*, 836 F. Supp. 2d at 423.  By using and disclosing Micron's trade secrets in the UMC/Jinhua Patent Filings as set forth herein, UMC and Jinhua engaged in acts of misappropriation and acts in furtherance of their misappropriation from Micron in the U.S. and this District.  (FAC ¶ 4.)

UMC's Motion fails to provide any legal support for its arguments regarding patent filings as a basis for personal jurisdiction.  First, without citing to case law, UMC claims that Micron failed to relate Wang's U.S. downloads (FAC ¶ 47) to the patents listed in the FAC ¶ 95.  Tellingly, UMC cites no authority requiring express detailed allegations of such a nexus between the UMC/Jinhua Patent Filings and trade secrets stolen from within the United States.  Such a nexus would, in effect, force Micron to show that UMC had sufficient minimum contacts with the United States *twice*, which is simply not required.  Rather, it is the act of filing in the U.S. that matters, not the source of the information in the filing that matters.  The only legal requirement is that the claims at issue must arise out of or relate to the patent filings, which they do.  *See Touchcom, Inc.*, 574 F.3d at 1416-17; *Am. Wave Machines,* 2014 WL 10475281, at *8.  And even if the law did require such a nexus, Micron has sufficiently pled it.  (*See* FAC ¶¶ 47-51, 95, 108.)

Second, UMC claims that the UMC/Jinhua Patent Filings "bear no relationship to any conduct at issue in the FAC."  (*See* Mot. 20:24-27.)  This is untrue.  Micron alleged that many of the UMC/Jinhua Patent Filings—providing eleven examples—"constitute[e] improper use and disclosure of Micron's trade secrets."  (FAC ¶¶ 4, 95.)  Micron further alleged that "[b]y using and disclosing Micron's trade secrets in the UMC/Jinhua Patent Filings as set forth herein, UMC and Jinhua engaged in acts of misappropriation and acts in furtherance of their misappropriation from Micron in the United States and in this District."  (FAC ¶ 4.)  Bottom line, Micron's claim for trade secret misappropriation directly relates to and arises out of the UMC/Jinhua Patent Filings.  *See Touchcom, Inc.*, 574 F.3d at 1416-17.

Third, UMC claims that "Micron did not identify what trade secrets were allegedly misappropriated in the patent filings."  (Mot. 19:26.)  Again, this is untrue.  Not only does Micron

identify the trade secrets, but it identifies the actual filenames and relevant page numbers of the documents that were in the UMC's possession, doing so for eleven examples.  (FAC ¶ 95(a)-(k).)

Micron's trade secret misappropriation claim arises out of UMC/Jinhua Patent Filings in the U.S. and that fact alone should warrant a finding of personal jurisdiction under Rule 4(k)(2).

**B.      UMC Led a Delegation of UMC and Jinhua Executives into the U.S. to Recruit Semiconductor Engineers.**

UMC's delegation to Silicon Valley in October 2016 was an almost week-long excursion in which UMC took substantial steps in furtherance of its misappropriation plot to recruit for the UMC/Jinhua DRAM project.  Trade secret misappropriation can be sufficiently plead by the allegation of use of stolen information to recruit employees and customers. *Labor Ready, Inc. v. Williams Staffing, LLC*, 149 F. Supp. 2d 398, 411–12 (N.D. Ill. 2001).

As late as 2016, Jinhua had no engineers with DRAM experience (FAC ¶ 12), and UMC was not in the DRAM business (FAC ¶ 13).  UMC and Jinhua needed engineering talent to deploy the stolen technology. As such, in June 2016, job openings were posted on the U.S.-based organization CASPA's website advertising a variety of DRAM positions.  (FAC ¶ 80.)  Then, in October 2016, top UMC executives—including Chen himself—organized and led a joint delegation with Jinhua's leadership to the annual meeting of CASPA in Silicon Valley.  (FAC ¶¶ 24-25.)  Jinhua was recruiting engineers at the CASPA job fair with UMC's assistance.  (FAC ¶ 27.)  UMC and Jinhua jointly prepared material to present to the attendees at the CASPA job fair, including milestone and technology roadmap information.  (*Id.*)  Chen, a UMC representative at the time, also contributed to Jinhua's presentation and fielded questions from the audience and prospective hires. (FAC ¶ 80.)

Approximately 60-80 engineers attended the CASPA event, and UMC interviewed roughly 20 of them, many residing in Northern California.  (*Id.*)  UMC's claim that no one was hired is irrelevant.  UMC's efforts to recruit for the DRAM project constituted U.S. acts in furtherance of UMC's misappropriation and support the Court's jurisdiction.  (FAC ¶ 82.)

**C.      The UMC-Jinhua Delegation Also Enlisted California Equipment Suppliers.**

Nor was UMC's week-long trip to Silicon Valley limited to recruiting; it also included

1    equipment vendor meetings.  Courts have found that meetings with companies constitute

2    "purposeful direction" to a forum and support personal jurisdiction.  *See Synthes (U.S.A.) v. G.M.*

3    *Dos Reis Jr. Ind. Com de Equip. Medico*, 563 F.3d 1285, 1290 (Fed. Cir. 2009); *see also Burger*

4    *King Corp. v. Rudzewicz*, 471 U.S. 462, 475-76 (1985).  Here, the UMC-Jinhua delegation spent

5    several days visiting leading suppliers of semiconductor equipment in this District.  (FAC ¶ 83.)

6    The suppliers included Applied Materials, KLA-Tencor, and Lam Research, all based in Northern

7    California.  (FAC ¶ 38.)  With Micron's confidential DRAM technology in hand, (FAC ¶ 37),

8    UMC knew precisely what equipment it needed.

9         In fact while meeting with the vendors, UMC/Jinhua had already placed orders for DRAM

10   manufacturing equipment and vendors had performed tool demonstration work for the DRAM

11   project.  (FAC ¶¶ 42, 83.) ███████████████████

12   ████████████████████████  (FAC ¶ 45.)  For each of the vendors, UMC's local contacts

13   contributed to the sale and export of the very equipment UMC and Jinhua would use to exploit

14   Micron's stolen technology.  (FAC ¶¶ 46, 84.)  Like its recruiting, UMC's business meetings with

15   crucial suppliers in this District were acts in furtherance of its scheme of misappropriation and

16   support the Court's jurisdiction (FAC ¶ 84.).  *See Synthes*, 563 F.3d at 1290.

17        **D.    UMC Downloaded Micron Trade Secrets from U.S. Servers**

18        UMC and its agents knowingly and systematically stole Micron's trade secrets from

19   servers in the U.S.  Agents include Wang, Ho and all of the Co-conspirators.  (FAC ¶¶ 19-20.)

20             **1.    Ho and Wang Accessed and Stole Thousands of Micron Confidential**
                       **Documents—Many from U.S. Servers.**
21

22                  **a.    Ho Stole 20,000 Micron Technical Documents for UMC.**

23        Ho did much more than tap into the technical expertise of a former Micron colleague.  As

24   he admitted under oath, Ho had secretly accumulated over 20,000 Micron technical documents

25   while at Micron.  (FAC ¶ 54.)  When he left Micron to join Chen at UMC, Ho took those files

26   with him to UMC.  (FAC ¶ 53.)  And Ho repeatedly accessed those documents from his UMC

27   computer during the course of his work for UMC.  (FAC ¶ 56.)  Contrary to UMC's assertion that

28   Ho did not download from U.S. servers, Ho conceded that one source of documents was Micron's

1    SharePoint system (Dkt. 95-2 (Ho Dep. 72:18-20))—a system housed exclusively on U.S. servers.

2    (FAC ¶ 47.)

3         Nor were Ho's acts of misappropriation the work of a rogue employee operating without

4    UMC's approval.  UMC knew of Ho's trade secret theft and fully ratified his misconduct.  (FAC

5    ¶ 58.)  In fact, UMC discovered that Ho possessed more than 20,000 Micron files on external

6    drives while employed by UMC.  (*Id.*)  Yet, prior to the February 2017 dawn raid conducted by

7    the Taiwanese criminal authorities, UMC did nothing to confiscate, destroy, or return the stolen

8    Micron's documents.  (*See generally* Taiwan Indictment.)  To this day, UMC has done nothing to

9    discipline Ho for his misconduct.  (FAC ¶ 58.)

10                      **b.      Wang Accessed U.S. Servers for UMC.**

11        Multiple sources of evidence demonstrate that Wang took Micron trade secrets directly

12   from U.S. servers.  While Ho was trying to recruit him, Wang was requesting access to Micron's

13   U.S. based CAD system in Boise, Idaho, so that he could remotely view (and make screenshots)

14   of the CAD drawings of Micron's DRAM chips.  (FAC ¶ 47.)  In addition, Wang downloaded

15   over 1,200 Micron technical files—mostly during his last days at Micron-Taiwan.  (*Id.*)  Of those

16   files, at least 174 were accessed or downloaded directly from Micron's SharePoint system, which

17   is hosted exclusively on U.S. servers.  (*Id.*)

18                 **2.      Chen, Ho and Wang All Knew, or Should Have Known, That
                            Confidential Micron Documents Were Downloaded from U.S. Servers.**
19

20        UMC's employees and agents knew or should have known they were targeting the U.S.

21                      **a.      The Legal Standard Is Constructive—Not Actual—Knowledge.**

22        Contrary to UMC's assertions, the law does not require a defendant to subjectively

23   "know" it was accessing servers in a forum to be subject to personal jurisdiction in that forum.

24   Instead, the defendant will be found to have purposefully directed its conduct to the forum even if

25   it only reasonably should have known that the plaintiff's servers were located there.  *Synopsys,*

26   *Inc. v. Ubiquiti Networks, Inc.*, No. 17-cv-00561-WHO, 2017 WL 3485881, at *25-26 (N.D. Cal.

27   July 15, 2017) (allowing personal jurisdiction based off defendant's knowledge of the location of

28   plaintiff's headquarters when accessing plaintiff's network); *Microsoft Corp. v. Mountain West*

1    *Computers, Inc.*, No. C14-1772 RSM, 2015 WL 4479490, at *7 (W.D. Wash. July 22, 2015)

2    (basing personal jurisdiction on defendants' remote access to servers in the forum, rejecting

3    actual knowledge of its location).[10]  Under this standard, Micron's allegations suffice, although

4    new facts leave no doubt that UMC's agents knew they were stealing trade secrets from the U.S.

5    b.    **Micron Is Headquartered, and Its Primary Operations Are Based, in Boise, Idaho—a Fact Well-Known to Chen, Ho and Wang.**

7          The UMC employees and agents who carried out UMC's misappropriation were Micron

8    insiders with deep knowledge of Micron's business operations and the central role that Micron's

9    Boise headquarters played in its R&D efforts.  Ho and Chen conceded they knew Micron was

10   headquartered in Boise.  (FAC ¶¶ 13, 16.)  In addition, Ho conceded that he knew of Fab 4—

11   Micron's chief R&D facility—and that it was located in Boise, Idaho.  (FAC ¶ 55.)  ████

12   ████████████████████████████████████████████████████████████████ (*see* dkt. 75-10 (Ho

13   Dep. 75:22-76:11; 77:2-10; 96:12-97:10); Dkt. 75-93), and Ho's compilation of 20,000 stolen

14   Micron files includes many that expressly reference Fab 4 ("F4") and Boise.  (FAC ¶¶ 54-55;

15   Dkt. 75-93.)  In short, UMC employees at the center of the misappropriation plot were fully

16   aware that UMC had acquired Micron's U.S.-sourced trade secrets, and those trade secrets could

17   have been acquired only by accessing resources approved through Micron's Boise-based R&D

18   team.

19          Chen, Ho, and Wang also knew full well that there was an overwhelming likelihood that

20   at least some of the Micron technology they were acquiring for UMC was coming from the U.S.

21   (FAC ¶ 48.)  Each time Micron-Taiwan employees access their company computers, a system

22   initiation banner advises that they are accessing the data network of the U.S. parent entity

23   ***"Micron Technology, Inc."***  (*Id.*)  Similarly, the Micron Code of Conduct—which is a condition

---

[10] *See also MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727, 730 (2d Cir. 2012) (finding plaintiff sufficiently alleged knowledge of server location where the "record reflects that [plaintiff's] employees ... are, as a condition of employment, made aware of the housing of the companies' email system and their confidential and proprietary information in Waterbury"); *Summit Entm't, LLC v. Santia*, No. 2:11-cv-06310-ODW(SSx), 2014 WL 12577430, at *3 (C.D. Cal. June 24, 2014) ("Defendants purposefully availed themselves of the benefits and protections of California by accessing, viewing, and downloading content from the films from Summit's servers. . . . The servers are located in California.").

1  of each Micron-Taiwan employee's employment—expressly advises that Micron is a U.S.

2  company and that the conduct of Micron-Taiwan employees may be governed by U.S. law.  (*Id.*)

3  At minimum, UMC's agents were on notice their misappropriation could reach into the U.S. and

4  be punished by U.S. authorities.  (*Id.*)  Any purported ignorance of U.S. contacts by Chen, Ho, or

5  Wang would, at best, betray a "reckless disregard" of their U.S. target sufficient to support

6  personal jurisdiction.  *See Synopsys*, 2017 WL 3485881, at *25-26.

7              **c.      Wang Actually Knew He Was Downloading from U.S. Servers.**

8          With Wang, the picture is even starker:  the forensic evidence documenting his server

9  access, and his responsibilities as a Site Collection Administrator ("SCA") for Micron's

10  SharePoint system, confirm that he knew his misappropriation efforts targeted U.S. servers.

11          Wang's own emails show he contacted the Boise-based system administrators to access

12  Micron's Boise-based R&D CAD servers in January 2016, even though he had transferred from

13  Micron-Taiwan's Process Integration ("PI") Group into the Quality Assurance Group, where

14  access to confidential CAD designs were not necessary.  (FAC ¶ 50.)  Micron's system

15  administrators advised Wang he did "not have an account on the R&D ***Boise*** network" and an

16  account required supervisor approval.  (*Id.*)  Knowing the system contained some of Micron's

17  most confidential trade secrets, Wang contacted Sanderson Wu—supervisor for his outgoing role

18  in PI—and obtained the necessary permission.  (*Id.*)  The Boise-based system administrators

19  responded to Wang in an email captioned "New ***Boise*** Linux account for you."  (*Id.*)

20          Wang knowingly connected to his "New ***Boise*** Linux account" on a Boise server to access

21  Micron's R&D CAD system on at least 28 separate days—including his very last day at Micron,

22  while acting as a UMC "team member."  (FAC ¶ 51.)  At the same time, Wang was also operating

23  screen-capture software that allowed him to snip images of files he viewed for later export, and in

24  fact he created a folder called "25nm 4G3D CAD data" on his personal Google Drive account.

25  (*Id.*)  The notion that Wang was somehow unaware of his contacts with the U.S. is not credible.

26          Wang also knew or should have known he was connecting to U.S. servers when he

27  accessed and downloaded Micron trade secrets from Micron's SharePoint system.  As explained

28  above, Wang accessed and/or copied at least 174 files from Micron's U.S.-Based SharePoint

MICRON'S OPP'N TO UMC'S MOTION TO DISMISS
Case No. 3:17-CV-06932-MMC

1   Servers—most after secretly accepting UMC's job offer.  (FAC ¶ 47.)  Far from an average

2   SharePoint user, Wang was the SCA for his PI Group.  (FAC ¶ 49.)  As such, he managed the site

3   quota and content contained on the SharePoint site, and he was responsible for contacting

4   Micron's Boise-based IT service desk on behalf of other PI engineers.  (*Id.*)  As a SCA, he had

5   access to repeated corporate trainings on SharePoint—including trainings in which Micron

6   expressly stated that all SharePoint servers were consolidated to a single Boise location.  (*Id.*)

7   Wang's own correspondence confirms he was sophisticated in Micron's network, putting him on

8   notice that central SharePoint resources were based in the U.S.  (*Id.*)

9   **V.    UMC FAILED TO SATISFY THE HIGH BURDEN FOR DISMISSAL BASED ON**
   **FORUM NON CONVENIENS**

10        **A.    Forum Non Conveniens Is Not Warranted.**

11        The burden is extremely high for forum non conveniens, and UMC has not met it.  "A

12   party moving to dismiss based on forum non conveniens bears the burden of showing (1) that

13   there is an adequate alternative forum, and (2) that the balance of private and public interest

14   factors favors dismissal."  *Dole Food*, 303 F.3d 1104, 1118 (9th Cir. 2002).  "The plaintiff's

15   choice of forum will not be disturbed *unless* the 'private interest' and 'public interest' factors

16   *strongly favor* trial in the foreign country."  *Id.* (emphasis added).  "Forum non conveniens is 'an

17   exceptional tool *to be employed sparingly*,[not a] ... doctrine that compels plaintiffs to choose the

18   optimal forum for their claim.'"  *Id.* (emphasis added) (citations omitted).  Here, UMC has not

19   demonstrated that Taiwan is an adequate forum, nor that the balance of factors favor dismissal.

20        **1.    Taiwan Is Not an Adequate Forum.**

21        UMC has the burden to show an adequate alternative forum, which it has failed to do.

22   *Dole Food*, 303 F.3d at 1118.  "A foreign forum is adequate when it provides the plaintiff with a

23   sufficient remedy for his wrong."  *Id.*  A foreign forum will not be adequate, for example, if it

24   cannot assert "personal jurisdiction over *all* defendants."  *Nibirutech Ltd. v. Jang*, 75 F.Supp. 3d

25   1076, 1087 (N.D. Cal. 2014) (emphasis in original).  Here, UMC has failed to show that a Taiwan

26   court could exert personal jurisdiction over Jinhua.  While UMC might argue that Micron could

27   separately sue Jinhua in China, that is not the requirement for an adequate forum.  *See id.*  Even if

28   it was, as Micron has previously briefed, to litigate in China against a state-owned company like

Jinhua would be futile.  (Dkt. 116-4 at 19:14-20:5; 21:25-28.)  Taiwan is not an adequate forum.

### 2.        The Private and Public Interest Factors Weigh Against Dismissal.

If the Court finds Taiwan to be an adequate forum, the balance of private and public interest factors must still *strongly favor* trial in a foreign country for the Court to grant a dismissal.  *Dole Food*, 303 F.3d at 1118. The factors, however, weigh in favor of a U.S. forum.

**Private Factors:**  The private interest factors are: "(1) the residence of the parties and the witnesses; (2) the forum's convenience to the litigants; (3) access to physical evidence and other sources of proof; (4) whether unwilling witnesses can be compelled to testify; (5) the cost of bringing witnesses to trial; (6) the enforceability of the judgment; and (7) all other practical problems that make trial of a case easy, expeditious and inexpensive." *Boston Telecomms. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206–07 (9th Cir. 2009).

**(1) The residence of the parties and the witnesses.**  Roughly 450 Micron professionals (including engineering, management, and executive positions) are located in Micron's Milpitas facility, including Micron's President and CEO, its Executive Vice President and Chief Business Officer, and the heads of three of the company's four business units.  (FAC ¶ 62; Dkt. 42-1, Myers Decl. ¶ 4.)  Two such business units are of special relevance to this case, including the Compute & Networking Business Unit ("CNBU") and the Mobile Business Unit ("MBU"), which are responsible, among other things, for Micron's product road mapping and marketing of DRAM products to PCs and mobile devices, respectively.  *Id.*  Further, UMC has appeared before this Court in *U.S.A. v United Microelectronics Corp., et al.*, Case No. 3:18-cr-00465 ("U.S. Criminal Action"), and has another pending case in this Court, *U.S.A. v United Microelectronics Corp., et al.*, Case No. 5:18-cv-06643 (the "U.S. Civil Action").  These two actions closely relate to this case.  As such, UMC will already be required to bring relevant witnesses to this District.  This factor favors Micron.

**(2) The forum's convenience to the litigants.**  This factor incorporates the previous paragraph's facts.  In addition, courts find a strong presumption in favor of plaintiffs on this factor.  *Boston Telecomms.*, 588 F.3d at 1206.  Further, while Micron could have brought this matter in Boise, Idaho, it chose not to due in part for convenience of the defendants.  For

example, the Northern District of California has international airports and easier access for defendants than Boise, Idaho. *See Rare Breed Distilling v. Heaven Hill Distilleries*, No. C-09-04728 EDL, 2010 WL 335658, at *8 (N.D. Cal. Jan. 22, 2010) (noting convenience of direct flights to San Francisco). Most importantly, UMC declared under penalty of perjury that: "A trial in Northern California would be significantly more convenient for UMC Taiwan's potentially relevant employees," because of the proximity to Taiwan and "employees could work at UMC USA's offices in Sunnyvale, California if required to travel to Northern California in connection with [the] lawsuit." (Dkt. 42-1, Myers Decl. ¶ 5.) This factor favors Micron.

**(3) Access to physical evidence and other sources of proof.** Physical evidence should already be here, as the U.S. Criminal Action and U.S. Civil Action are before this Court. In fact, much of the evidence is already in the United States—from technical details about Micron's technology, to the measures the company took to protect its secrets, to the forensic evidence of UMC's misappropriation, to the economic damage that UMC's and Jinhua's misconduct has caused, and all Micron experts and some witnesses. (Dkt. 42-1 Myers Decl. ¶ 6.) This factor favors Micron.

**(4) Whether unwilling witnesses can be compelled to testify.** Due to the U.S. Criminal Action and U.S. Civil Action before this Court, Micron expects overlap of witnesses between the cases. Additionally, this issue would not be resolved by bringing it in Taiwan. Jinhua is a Chinese company, and Taiwan cannot compel foreign witnesses to testify. *See Manu Int'l., S.A. v. Avon Prods, Inc.*, 641 F.2d 62, 67 (2d Cir. 1981) (the unavailability of compulsory process over witnesses weighed against Taiwan trial). This factor favors Micron.

**(5) The cost of bringing witnesses to trial.** The costs for bringing witness to trial would be neutral, because: (i) the Court needs to offset Micron's costs for sending witnesses /experts to Taiwan, *see Mintel Learning Tech., Inc. v. Beijing Kaidi Educ. & Tech. Dev. Co.*, No. C 06-7541 PJH, 2007 WL 2403395, at *10 (N.D. Cal. Aug. 20, 2007); (ii) if timed correctly, witnesses brought to here for the parallel proceedings could defray the costs in this proceeding; and (iii) UMC has a wholly-owned subsidiary in this District where employees can work. (Dkt. 42-1 ¶ 5.)

**(6) The enforceability of the judgment.** UMC has reported inter-party sales into the

U.S. to UMC Group (USA) of approximately $1.8 billion.  (FAC ¶ 11.)  UMC recently reported that 43% of its foundry sales are in North America, and those sales derive primarily from the U.S. (*Id.*)  Due to UMC's large, lucrative presence in the U.S., the enforceability of judgment should not be an issue.  *Cooper v. Tokyo Elec. Power Co., Inc.*, 166 F. Supp. 3d 1103, 1135 (S.D. Cal. 2015), aff'd, 860 F.3d 1193 (9th Cir. 2017) (denying motion to dismiss for forum non conveniens, finding that enforceability of judgment factor was neutral where the defendant was headquartered in Tokyo but also had "significant assets" in the U.S.).  This factor favors Micron.

**(7) All other practical problems that make trial of a case easy, expeditious and inexpensive.**  Trade secrets were stolen from Micron, a U.S. company protected under U.S. laws. Micron and the U.S. have a vested interest in protecting its intellectual property rights.  Raising only issues under U.S. law, namely the DTSA, CUTSA and RICO, a trial in the U.S. will be more efficient than a forum unfamiliar with U.S. law.  *See, e.g., CYBERsitter, LLC v. People's Republic of China,* No. CV 10-38-JST SHX, 2010 WL 4909958, at *8 (C.D. Cal. Nov. 18, 2010) (denying motion to dismiss for forum non conveniens, even though only four of its seven claims relied on California and federal law); *Condos v. Condos*, No. CV 04-07365 DT (SHx), 2006 WL 8431432, at *4 (C.D. Cal. Feb. 9, 2006) (reasoning that "where questions of California law predominate, the Court is disinclined to dismiss the case simply because certain questions of Greek law may arise," and some foreign law "does not mandate dismissal").  This factor favors Micron.

**Public Interest Factors**: The public interest factors are: "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum."  *Boston Telecomms.*, 588 F.3d at 1211.

**(1) The local interest in the lawsuit.**  Both locally and the U.S. have a very strong interest in this lawsuit.  First, Micron has a very large presence locally.  Micron, a multi-billion dollar company, has two DRAM related business units located in Milpitas, one accounting for roughly 42 percent of the company's net sales in Fiscal Year 2017, and the other accounting for 22 percent of Micron's net sales in Fiscal Year 2017.  (Dkt. 42-1 Myers Decl. ¶ 4.)  This case directly impacts those DRAM sales, and therefore this District.

As for the U.S., it too has a large interest.  This case was brought under the DTSA.

Legislative history of the DTSA leaves no doubt that Congress viewed it as an imperative public

interest to provide U.S. technology companies a federal, private right of action to defend against

misappropriation taking place abroad.  Explaining the rationale, Congress recognized the

necessity for the DTSA for "making whole the victims of misappropriation."  H.R. Rep. No. 114-

529 at 3-4.  In short, Congress enacted the DTSA to promote the national interest in enlisting civil

enforcement against foreign violators of trade secret laws. Congress additionally made the

following mandate related to the DTSA:

> American businesses that compete globally will lose their
> competitive edge if they cannot quickly pursue and stop thieves
> looking to shortcut the innovative products, designs, and processes
> that have fueled our economy.  This bill will equip companies with
> the additional tools they need to protect their proprietary
> information. . . . As trade secret owners increasingly face threats
> from both at home and abroad, the bill equips them with the tools
> they need to effectively protect their intellectual property and
> ensures continued growth and innovation in the American economy.

H.R. Rep. No. 114-529 at 6.  Congress enacted the DTSA, because it was *necessary* to provide

U.S. businesses with a U.S. forum to obtain effective protection and redress of their trade secrets

misappropriated abroad.  That there may, in theory, be some alternative forum where Micron

could attempt to assert its rights does nothing to alter Micron's interest—and the national

interest—in having its federal claims adjudicated here.  This factor strongly favors Micron.

**(2) The court's familiarity with the governing law.**  As stated above, this lawsuit is

brought under the DTSA, CUTSA and RICO.  This factor favors Micron.

**(3) The burden on local courts and juries.**  This factor would likely be neutral as the

burden will be the same for both U.S. courts and Taiwanese courts.  One issue often raised are

translations, but regardless of forum—U.S. or Taiwan—there will likely be extensive translations

of testimony between the two languages. *See CYBERsitter, LLC*, 2010 WL 4909958, at *8.

**(4) Congestion in the court.**  "Congestion . . .is afforded little weight in assessing the

public interest factors." *In re Air Crash Over Taiwan Straits on May 25, 2002*, 331 F. Supp. 2d

1176, 1203 (C.D. Cal. 2004); *see Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1337 (9th Cir.

1984) (finding it "unfair for a court to subject a United States corporation to the courts of another

country merely because plaintiff's home country courts are congested.")  Here, as in *In re Air Crash* "it is difficult to ascertain whether retention of the actions in the United States or transfer to Taiwan would result in a more expeditious resolution of plaintiffs' claims," (331 F. Supp. 2d at 1203), and as such this factor is neutral.

**(5) The costs of resolving a dispute unrelated to a particular forum.**  This factor is not applicable, as it only applies if dispute was unrelated to one of the forums, which is not the case.

Overall, the private and public factors weigh in favor of Micron.  Even if they did not, they definitely do *not* weigh "strongly" in favor of UMC, and therefore, the Court must deny UMC's motion to dismiss on forum non conveniens.  *See Dole Food*, 303 F.3d at 1118.

> **B.     Employment Agreements with Non-Parties Cannot Suffice to Support Forum Non Conveniens**

UMC erroneously relies on a provision in Micron's employment agreements—with non-party former employees—to claim that Taichung District Court in Taiwan is the proper venue for this case.  UMC's argument fails for two, independent reasons: (1) the provision on which UMC relies is a permissive, jurisdictional clause rather than a mandatory forum selection clause; and (2) the employment agreements are with non-party employees.

First, contrary to UMC's assertions, Micron's employment agreements do *not* restrict jurisdiction to Taichung District Court of Taiwan ("Taichung"), but merely consent to jurisdiction in Taichung.  (Dkts. 160-3, 160-4 ¶ 18.)  A forum selection clause may be either mandatory or permissive as to jurisdiction.  *See Hunt Wesson Foods, Inc. v. Supreme Oil Co.*, 817 F.2d 75, 77 (9th Cir. 1987).[11]  Only a mandatory forum selection clause can be enforced against Micron under forum non conveniens.  To determine whether a clause is mandatory or permissive courts rely on

---

[11] "When only jurisdiction is specified the clause will generally not be enforced without some further language indicating the parties' intent to make jurisdiction exclusive."  *Docksider, Ltd. v. Sea Tech., Ltd.*, 875 F.2d 762, 763-64 (9th Cir. 1989) (making venue exclusive includes more than just agreement to jurisdiction, such as: "Licensee hereby agrees and consents to the jurisdiction of the courts of the State of Virginia. *Venue of any action brought hereunder shall be deemed to be in Gloucester County, Virginia*.") (emphasis added).  Other mandatory language includes: "any claim . . . shall be determined by the courts in Seoul *and no other courts*." *Fireman's Fund Ins. Co. v. M.V. DSR Atl.*, 131 F.3d 1336, 1337 (9th Cir. 1997) (emphasis added); *see also Talatala v. Nippon Yusen Kaisha Corp.*, 974 F. Supp. 1321, 1325 (D. Haw. 1997) (finding that "any action thereunder *shall be brought* before the Tokyo District Court in Japan," (emphasis added), was mandatory, because it did not leave open other venues).

the common or normal meaning of language to interpret its meaning. *Hunt Wesson*, 817 F.2d at

77.  Since the analysis turns on principles of contract interpretation, a district court's

interpretation of a forum selection clause may be reviewed *de novo*. *Id.*  Cases that have

interpreted the exact language at issue here—"agree to be subject to"—have found that particular

phrase to be permissive. *Basic Fun, Inc. v. POP Mktg. Grp., Inc.*, No. CIV.A. 06-1129, 2006 WL

1648982, at *1 (E.D. Pa. June 12, 2006) (finding "agree to be subject to the jurisdiction and

venue of the State and Federal Courts of the State of Kentucky," to be "permissive, not

mandatory"); *Wood v. World Wide Ass'n of Specialty Progs. & Sch., Inc.,* No. 2:06-CV-708 TS,

2007 WL 2821768, at *1-2 (D. Utah Sept. 27, 2007) (finding the following to be permissive:

"agree to be subject to jurisdiction . . . of Montana in any dispute between the parties").

     Here, Micron's employment agreements state that: "in case of any litigation arising

thereof, the parties agree to be subject to Taichung District Court."  (Dkts. 160-3, 160-4 ¶ 18.)

Nowhere do the employment agreements include mandatory language such as jurisdiction "shall

be brought" or that "no other courts" may preside over the action.  The plain meaning of Micron's

employment agreements—supported by the case law—is that the parties consent to jurisdiction in

Taichung is permissive. *Basic Fun, Inc.*, 2006 WL 1648982, at *1; Wood, 2007 WL 2821768, at

*1-2.  Since the forum selection clause is not mandatory, UMC's argument fails.

     UMC, however, attempts to lead the Court astray by claiming that two cases with "agree

to be subject to" language require a mandatory forum.  Those two cases, however, are

distinguishable as both *include mandatory forum clauses* resulting in the enforcement of forum.

The first case—*VBConversions LLC v. Buildertrend Sols., Inc.*, No. 2:17-cv-02266-CAS(JEMx),

2017 WL 2469969, at * 1 (C.D. Cal. Jun. 5, 2017)—enforced forum because the contract stated

that "the *sole and exclusive* venue for resolution of such disputes shall be the Superior Court for

the County of Los Angeles." *Id.* at *1. (Emphasis added.)  The second case—*Ruehl v. AM Gen.*

*LLC*, No. 10-C-182, 2010 WL 2720758, at *2 (E.D. Wis. Jul. 2, 2010)—enforced a forum clause

because the contract stated that "Any legal action to enforce this Agreement *shall be brought* in

St. Joseph County, Indiana." *Id.* at *2. (Emphasis added.)  Again, UMC, tries inferring that the

reason *Ruehl* enforced the forum clause was due to the "agree to be subject to" language, but it

1   was actually the mandatory clause "shall be brought" in Indiana.  *See id.*  The Court should deny

2   UMC's motion on this ground alone.

3           Second, the jurisdictional provision of Micron's employment agreements should not apply

4   to this lawsuit as the employees are not parties to this action.  "In general, a non-party to a

5   contract cannot enforce it."  *Grabhorn v. HSBC Bank USA*, No. CV 12-8540-GHK (SHX), 2013

6   WL 12130011, at *2 (C.D. Cal. Jan. 10, 2013).  Of course, there are certainly exceptions, such as

7   third party beneficiaries to contracts, or as in the cases that UMC point outs, where there are

8   extremely close ties to the signatory.  And, importantly, all the cases cited by UMC are

9   distinguishable, because the signatories in those cases are also parties alongside the closely

10   related non-parties.[12]  Here, that is not the case, as none of the signatory employees are parties.

11           For example, UMC claims that *Manetti-Farrow, Inc. v. Gucci America, Inc.* holds for the

12   proposition that non-parties to an agreement may be subject to its provisions.  858 F.2d 509, 514

13   n.5 (9th Cir. 1988).  Specifically, the *Manetti-Farrow* court finds a forum selection clause may

14   apply to non-parties, but only if they are closely related.  *Id.* at 511.  *Manetti-Farrow* involved a

15   forum selection clause between two parties, Manetti-Farrow and Gucci Parfums.  *Id.*  Unlike here,

16   both signatories were parties to the litigation.  *Id.*  The "non-parties" who were also held to the

17   contract in *Manetti-Farrow*, were closely related individuals and entities, including subsidiaries,

18   directors and officers.  *Id.*  Based on the foregoing, *Manetti-Farrow* can be distinguished here,

19   because: (i) the signatories to the Micron employment agreements are not parties to this action,

20   and (ii) regardless, Wang, Ho and Lee are not closely related to UMC such as directors, officers

21   or subsidiaries.  The other cases to which UMC cites, are similarly distinguishable.[13]

22           [12]*See Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721, 724-25 (9th Cir. 1999) (finding that
23   plaintiff's claims were subject to an arbitration clause in a contract it *entered with defendant*);
     *Chloe Z Fishing Co Inc. v Odyssey Re (London) Ltd.*, 109 F. Supp. 2d 1236, 1240 (S.D. Cal.
24   2000) (considering motion to compel arbitration based on contract *entered by parties*); *Prograph
     Intern Inc v Barhydt*, 928 F. Supp. 983, 986-87 (N.D. Cal. 1996) (same); *Concat LP v Unilever
25   PLC*, 350 F. Supp. 2d 796, 805 (N.D. Cal. 2004) (same); *Mitsubishi Motors Corp v Soler
     Chrysler-Plymouth Inc.*, 473 U.S. 614, 616-17 (1985) (same).
26           [13] First, in *Synthes, Inc. v. Emerge Med., Inc.*, 887 F. Supp. 2d 598, 600-602 (E.D. Pa.
     2012), as in *Manetti-Farrow*, the signatories are a party to the litigation, and the only non-parties
27   are closely related individuals (*e.g.*, a CFO that worked with lawyers to work around the
     agreement at issue).  *Synthes*, 887 F. Supp. 2d at 610-11.  This is not the case here.  Second,
28   *Simula, Inc. v. Autoliv, Inc.* involves the exact two parties to the agreement at issue and the only
     "non-parties" are again the closely related subsidiaries to the parties, which is not the case here.

Finally, many of the cases UMC cites concern interpretation of arbitration clauses, which are not relevant here, and which courts interpret more broadly than other contractual provisions.[14] *See, e.g., Mitsubishi Motors*, 473 U.S. at 626 (noting that in light of the "federal policy favoring arbitration … any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration," and "the parties' intentions … are generously construed as to issues of arbitrability"). UMC's reliance on these cases to claim that its current dispute with Micron "aris[es] out of or in connection with" Micron's employment agreements is misplaced.

## VI.    CONCLUSION

In sum, UMC purposefully availed itself of the U.S. by filing over one hundred patents (many containing Micron trade secrets), by recruiting in this District and by meeting with and purchasing equipment from vendors in this District.  The patent filings alone should suffice under Rule 4(k)(2) for jurisdiction, but the aggregate of these all these allegations sufficient pled in Micron's FAC definitely do.  Moreover, UMC's arguments for forum non conveniens fail as they depend on employment agreements not asserted in this case (involving non-party employees), and its arguments further fail for not meeting the high burden of proving the relevant factors.  The Court should deny UMC's motion to dismiss.

Dated: March 8, 2019                              JONES DAY

                                                 By:   *s/ Randall E. Kay*
                                                       Randall E. Kay

                                                 Attorneys for Plaintiff
                                                 MICRON TECHNOLOGY, INC.

NAI-1506555770

---

175 F.3d 716, 721, 724-25 (9th Cir. 1999).  Third, *Ultratech, Inc. v. Ensure NanoTech (Beijing), Inc.* applies a forum clause to a non-party defendant to an agreement, because that person was the subverter of the contract, which is not the case here. 108 F. Supp. 3d 816, 823 (N.D. Cal. 2015).

[14] To the extent UMC is arguing that Micron's employment agreements required Micron to engage in ADR in the instant litigation, this vague, unsupported claim fails for the same reasons as its forum selection arguments.