Randall E. Kay (State Bar No. 149369)
rekay@jonesday.com
Douglas L. Clark (State Bar No. 279408)
dlclark@jonesday.com
JONES DAY
4655 Executive Drive, Suite 1500
San Diego, CA  92121.3134
Telephone:	+1.858.314.1200
Facsimile:	+1.844.345.3178

Marcus S. Quintanilla (State Bar No. 205994)
mquintanilla@jonesday.com
JONES DAY
555 California Street, Suite 2600
San Francisco, CA 94104.1501
Telephone:	+1.415.626.3939
Facsimile:	+1.415.875.5700

Attorneys for Plaintiff
MICRON TECHNOLOGY, INC.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MICRON TECHNOLOGY, INC., <br><br>             Plaintiff, <br><br>     v. <br><br>UNITED MICROELECTRONICS CORPORATION, FUJIAN JINHUA INTEGRATED CIRCUIT CO., LTD., and DOES 1-10, <br><br>             Defendants. | **Case No. 3:17-CV-06932-MMC** <br><br>**PLAINTIFF MICRON TECHNOLOGY, INC.'S REPLY IN SUPPORT OF MOTION TO LIFT STAY** <br><br>Date:        January 8, 2021 <br>Time:       9:00 a.m. <br>Judge:      Hon. Maxine M. Chesney <br>Courtroom: 7, 19th Floor |

**TABLE OF CONTENTS**

I. Defendants Have No Fifth Amendment Rights, and Significant Progress Can Be Made in Civil Discovery without Triggering Fifth Amendment Concerns. ........................ 1

II. The Fifth Amendment Interests of Chen, Ho, Wang – and Other, Unidentified, Hypothetical Witnesses and Doe Defendants – Do Not Justify the Stay ............................. 3

    A. Courts Do Not Stay Cases Based on the Fifth Amendment Interests of Fugitives. ................................................................................................................ 3

    B. Courts Do Not Stay Cases Based on the Fifth Amendment Interests of Unidentified Witnesses or Doe Defendants. ............................................................ 4

    C. Prosecution Abroad Raises No Fifth Amendment Concern. ................................. 6

    D. Jinhua's August Trial Date Is a Red Herring: Even after the Trial, Defendants Will Make the Same Spurious Arguments for an Indefinite Stay. ........ 6

III. A Continued Stay Will Cause Micron Significant Prejudice ............................................... 7

    A. Regardless of Jinhua's Placement on the Entity List, Micron's DRAM Business in China Remains under Threat. ............................................................... 7

    B. Defendants' On-Going DRAM Patent Program Does Micron Significant Harm. ........................................................................................................................ 9

    C. A Prolonged Stay Jeopardizes Essential Evidence. .............................................. 10

IV. Lifting the Stay Will Not Give U.S. Prosecutors an Unfair Advantage. ............................ 11

V. The Court's Own Interests Favor Lifting the Stay. ............................................................ 12

VI. Public and Third-Party Interests Militate against a Continued Stay. ................................. 14

VII. Conclusion ........................................................................................................................ 15

# TABLE OF AUTHORITIES

Page

**CASES**

*800537 Ontario, Inc. v. World Imports U.S.A. Inc.*,
   145 F. Supp. 2d 288 (W.D.N.Y. 2001) .................................................................................. 6

*Applied Materials, Inc. v. Semiconductor Spares, Inc.*,
   No. C95-20129RMW(EAI) & C95-20156RMW(PVT),
   1995 WL 261451 (N.D. Cal. Apr. 26, 1995) ........................................................................ 12

*Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr., Inc.*,
   490 F.3d 718 (9th Cir. 2007).................................................................................................. 3

*Braswell v. United States*,
   487 U.S. 99 (1988).............................................................................................................. 2, 6

*Cal-Cleve, Ltd. v. Wrag-Time Air Freight, Inc.*,
   No. CV 04-10543 SJO, 2005 WL 8157878 (C.D. Cal. May 20, 2005) ................................ 11

*Fed. Ins. Co. v. Laney*,
   No. C 12-04708 WHA, 2013 WL 594267 (N.D. Cal. Feb. 14, 2013) .................................. 12

*Genentech, Inc. v. JHL Biotech, Inc.*,
   No. C 18-06582 WHA, 2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) .................................. 11

*GLL GmbH & Co. Messeturm KG v. LaVecchia*,
   247 F.R.D. 231 (D. Me. 2008) ............................................................................................... 6

*In re Mid-Atl. Toyota Antitrust Litig.*,
   92 F.R.D. 358 (D. Md. 1981)................................................................................................. 5

*Jones v. Conte*,
   No. C 045312SI, 2005 WL 1287017 (N.D. Cal. Apr. 19, 2005) ............................................ 1

*Keating v. Office of Thrift Supervision*,
   45 F.3d 322 (9th Cir. 1995).............................................................................................. 7, 11

*Microfinancial, Inc. v. Premier Holiday Int'l, Inc.*,
   385 F.3d 72 (1st Cir. 2004) .................................................................................................... 4

*Mr. Dee's, Inc. v. Int'l Outsourcing Servs., LLC*,
   No. 08-C-457, 2008 WL 4853601 (E.D. Wis. Nov. 3, 2008) ................................................ 5

*Square 1 Bank v. Lo*,
   No. 12-cv-05595-JSC, 2014 WL 7206874 (N.D. Cal. Dec. 17, 2014) ............................ 1, 12

*Taylor, Bean & Whitaker Mortg. Corp. v. Triduanum Fin., Inc.*,
  No. 2:09-cv-0954 FCD EFB, 2009 WL 2136986 (E.D. Cal. July 15, 2009) .............................. 5

*United States v. Balsys*,
  524 U.S. 666 (1998) ........................................................................................................... 6

*United States v. Kordel*,
  397 U.S. 1 (1970) ............................................................................................................... 6

*United States v. White*,
  322 U.S. 694 (1944) ........................................................................................................... 1

*Zuppardo v. Serv. Cab Co.*,
  No. CV 16-1914, 2017 WL 877318 (E.D. La. Mar. 6, 2017) ............................................. 5

**STATUTES**

35 U.S.C. § 135(b), (d) .............................................................................................................. 9

Economic Espionage Act, Pub. L. 104-294, 110 Stat. 3488 (Oct. 11, 1996) ............................ 14

**OTHER AUTHORITIES**

37 C.F.R. § 42.51 ....................................................................................................................... 9

77 Fed. Reg. 56068 (Sep. 11, 2012) .......................................................................................... 9

*Black's Law Dictionary* (11th ed. 2019) .................................................................................... 4

Fed. R. Civ. P. 33(a)(1) .............................................................................................................. 5

Fed. R. Civ. P. 45(a)(2)(c)(1)(B)(i) ..................................................................................... 5, 10

H.R. REP. No. 114-529, 114th Cong. (2d Sess. 2016) ....................................................... 14, 15

S. REP. No. 114-220, 114th Cong. (2d Sess. 2016) ........................................................... 14, 15

U.S. CONST. amend. V ...................................................................................................... passim

**REPLY IN SUPPORT OF MICRON'S MOTION TO LIFT STAY**

Since the Court stayed this case, circumstances have changed dramatically, and the stay should now be lifted. The two corporate defendants have no Fifth Amendment rights, UMC has pleaded guilty and pledged to cooperate, and the criminal trial of Jinhua will be over long before the civil case progresses to forms of discovery that could implicate the Fifth Amendment rights of individual witnesses. Such rights—and questions of alleged prejudice to defendants—can be addressed through the Court's Protective Order and appropriate sequencing of discovery.

The alternative is an unwarranted and protracted stay. Despite the defendants' tactical focus on Jinhua's upcoming trial date, the stay they seek would in fact extend far beyond fall 2021. The stay would undermine Micron's rights, the Court's own interests, and pressing public policies for the protection of trade secrets against international commercial espionage. Defendants have not carried their heavy burden to justify maintaining the stay, and it should be lifted.

**I.    Defendants Have No Fifth Amendment Rights, and Significant Progress Can Be Made in Civil Discovery without Triggering Fifth Amendment Concerns.**

Defendants concede that they have *no* Fifth Amendment rights because they are corporations. *United States v. White,* 322 U.S. 694, 699 (1944). In consequence, the defendants' case citations supporting a civil stay where the civil defendant is an *individual* with Fifth Amendment rights are entirely inapposite. *See, e.g., Jones v. Conte*, No. C 045312SI, 2005 WL 1287017, at *2 (N.D. Cal. Apr. 19, 2005); *Square 1 Bank v. Lo*, No. 12-cv-05595-JSC, 2014 WL 7206874, at *1 (N.D. Cal. Dec. 17, 2014).

Because neither UMC nor Jinhua have Fifth Amendment rights of their own, they base their argument on the Fifth Amendment rights of others. They contend that necessary defense witnesses *may* assert their right against self-incrimination during the civil case and, thus, unfairly impair the corporate defendants' right to a fair civil trial. (Dkt. 257 ("UMC Opp.") at 11:21–28; Dkt. 259 ("Jinhua Opp.") at 11:9–17.)[1]

///

---

[1] All docket citations refer to ECF page numbers.

Defendants' argument rests entirely on generalization and conjecture. Despite submitting five declarations—including one from Jinhua's Assistant President, Jinfu Zheng (Dkt. 261)—neither defendant has identified a single witness whom they actually expect to provide testimony helpful to their defense. Nor do the defendants explain why witnesses with testimony *helpful* to the civil defense must be expected to assert a Fifth Amendment right against self-incrimination. Notably, Chen, Ho, and Wang each chose to testify in the Taiwanese criminal proceedings, despite their right to remain silent under Taiwanese law. (Declaration of Jeanne Wang ("Wang Decl.") ¶¶ 3–4.) Chen and Ho also testified in this civil case. (*See* Dkts. 233-2 (Chen Depo.); 233-3 (Ho Depo.).) And Ho even admitted to taking 20,000 Micron files with him to UMC. (*See* Dkt. 233-3 (Ho Depo.) at 4:15–9:21, 16:23–17:23, 29:4–17, 39:16–22).) Defendants' assumption that all relevant defense witnesses will assert a Fifth Amendment privilege is unfounded.

Yet setting aside the questionable logic that underpins defendants' sole Fifth Amendment argument, a basic point bears emphasis: when the stay is lifted, both corporate defendants will be able to participate in significant discovery—and thus make significant progress in preparing the civil case for trial—without triggering any Fifth Amendment concerns. As Micron has explained (and defendants have not disputed), that discovery will come largely in the form of written discovery responses and documents produced directly from the corporate defendants. (Dkt. 256 ("Micron Mot.") at 19:6–13.)

Corporations have no Fifth Amendment privilege to decline to produce documents within their possession. *Braswell v. United States,* 487 U.S. 99, 100 (1988). Neither defendant challenges that blackletter law. Hence, UMC and Jinhua have no Fifth Amendment argument to withhold the documents, electronic records, and product samples that will likely play the decisive role in the civil trial. A prime example of such documents already came to light during the limited discovery that was permitted prior to the stay: a record from UMC's IT department showing that UMC knew Ho had misappropriated over 20,000 Micron files within days of his joining UMC. (*See* Dkts. 230 (SAC) ¶ 54; 233-3 (Ho Depo.) at 4:15–9:21, 16:23–17:23, 29:4–17, 39:16–22).)

Once the stay is lifted—and Micron overcomes what could be months of preliminary motions to dismiss and motions to compel production of documents—document discovery from

corporate records can run in parallel with the criminal case, and it will likely continue even after the criminal trial is over and before depositions begin. By the time the criminal trial concludes—likely in the fall of 2021—civil discovery will have advanced to a point where depositions are at least within sight. Not until those depositions begin will individual witnesses have Fifth Amendment concerns.

If, however, the stay is continued until after the criminal trial concludes, meaningful document discovery will likely not take place before 2022, and depositions could easily be pushed into 2023. And, if defendants have their way, and the stay covers the period of any appeal (*see* UMC Opp. at 11:21–25; Jinhua Opp. at 11:25–12:1; 24:15–17), the entire calendar of the civil case would be pushed out an additional 12 to 18 months. Requiring Micron to wait until 2024 or 2025 for meaningful deposition testimony in a case meant to redress theft committed in and prior to 2016 is simply not tenable.

## II. The Fifth Amendment Interests of Chen, Ho, Wang – and Other, Unidentified, Hypothetical Witnesses and Doe Defendants – Do Not Justify the Stay.

UMC and Jinhua argue for the stay based on the Fifth Amendment rights of two distinct groups – first, Chen, Ho, and Wang; and, second, other (unspecified) employees and potential "Doe" defendants. (UMC Opp. at 10–11; Jinhua Opp. at 9:11–12:3.) Defendants' argument must be rejected because they can offer no meaningful assurance that the purported Fifth Amendment concerns of either group will *ever* be resolved. To stay the case because those witnesses' Fifth Amendment interests might impair their (hypothetical) defense testimony in the civil case would be to suspend the civil case indefinitely. Ninth Circuit precedent rejects that outcome. *See Blue Cross & Blue Shield of Ala. v. Unity Outpatient Surgery Ctr., Inc.*, 490 F.3d 718, 724 (9th Cir. 2007).

### A. Courts Do Not Stay Cases Based on the Fifth Amendment Interests of Fugitives.

That Chen, Ho, and Wang will not voluntarily come to the U.S. for prosecution is obvious enough. Defendants do not dispute that in June 2020, all three men had the ability to travel to the United States for their scheduled arraignments before this Court. (*See also* Wang Decl. ¶ 7.) The

men willfully failed to appear—after previously obtaining eight continuances. (Crim. Dkts. 24, 40, 49, 60, 81, 94, 101, 112.)[2]  As defendants concede, Chen, Ho, and Wang cannot be extradited to the United States. (Jinhua Opp. at 10 n.3.) Two of the three—Ho and Wang—have now received lengthy prison sentences in Taiwan, making their travel to the United States even more unlikely. (Micron Mot. at 10:16–17; Dkt. 256-4 (Jeanne Wang Decl.) Ex. 1 at 4).) And Chen—though still a Jinhua executive (*see* Crim. Dkt. 148 ("UMC's Plea Agreement") at 3 ¶ 2(d))—has offered no assurance of his willingness to participate in the U.S. criminal proceedings. Notwithstanding defendants' display of indignation at the term "fugitive," the term is fitting: all three men are criminal suspects who have evaded arrest, prosecution, and service of process. *See Black's Law Dictionary* (11th ed. 2019) "Fugitive." The facts are plain: Chen, Ho, and Wang have shown that they have no intention of submitting to the jurisdiction of this Court or facing criminal charges in the United States.[3]

**B.  Courts Do Not Stay Cases Based on the Fifth Amendment Interests of Unidentified Witnesses or Doe Defendants.**

Aside from Chen, Ho, and Wang, UMC and Jinhua fail to identify any specific employee who might assert the Fifth Amendment, much less whose testimony will be crucial to their defense. Instead, they base their Fifth Amendment argument on a broad (and unsupported) assertion: "It thus goes without question that [defense] witnesses [in the civil case] will be subpoenaed to testify, produce documents, answer interrogatories, and be under court order to perform other discovery activities once the stay is lifted. . . . [M]any of them may justifiably fear being investigated and potentially prosecuted . . . if they agree to testify." (Jinhua Opp. at 11:1–5.)

---

[2] UMC asserts that "the individual defendants in the Taiwan action are not permitted to leave Taiwan" based on the fact that they have been convicted. (UMC Opp. at 7:23–24; Dkt. 258 (Yi Chen Decl.), ¶¶ 5, 7.) They had not yet been convicted when their repeated failure to appear led this Court to issue warrants for their arrest.

[3] Defendants criticize Micron for its "mere speculation" that these witnesses will not participate in the criminal case (*see, e.g.,* Jinhua Opp. at 10 n.3), but the criticism misses the mark. Defendants bear the "heavy burden" of justifying a stay. *Microfinancial, Inc. v. Premier Holiday Int'l, Inc.,* 385 F.3d 72, 77 (1st Cir. 2004). Here, that means giving the Court some assurance that these foreign witnesses will voluntarily come to the United States and have any U.S. criminal charges against them conclusively resolved in some reasonably foreseeable future. Notwithstanding that Ho remains a UMC employee and Chen is a current Jinhua executive, neither defendant has provided any such assurance.

Defendants' misuse of the Fifth Amendment does not withstand scrutiny.

Fifth Amendment interests of witnesses can favor a stay only when the civil defendant can show persuasively that its civil defense will in fact be compromised by lack of access to necessary defense testimony. The mere possibility "that some of the individual witnesses who are expected to be called in the civil matter will choose to assert their Fifth Amendment right against self-incrimination" is not enough to merit a stay where "it is far from certain that they will do so or that Defendant will be unable to fulfill its civil discovery obligations or mount a defense to the civil action without the testimony of those witnesses." *See Zuppardo v. Serv. Cab Co.*, No. CV 16-1914, 2017 WL 877318, at *5 (E.D. La. Mar. 6, 2017) (denying stay) – a case defendants pass over without comment.

Defendants have not demonstrated that any of their unidentified witnesses is "likely to be indicted or even that they are under a criminal investigation." *Id.* Instead, Defendants effectively ask the Court to grant a blanket stay until the conclusion of any potential criminal proceedings or investigations related to the facts of this case. That is not proper. *See In re Mid-Atl. Toyota Antitrust Litig.*, 92 F.R.D. 358, 359, 360 (D. Md. 1981) (denying requested stay "pending completion of any criminal proceedings which might be brought at some unspecified future time").

Tellingly, defendants have not cited a single case in which a stay was granted based on the hypothetical Fifth Amendment concerns of unidentified witnesses or individual Doe defendants. In *Mr. Dee's, Inc. v. Int'l Outsourcing Servs., LLC*, No. 08-C-457, 2008 WL 4853601, *1 (E.D. Wis. Nov. 3, 2008) and in *Taylor, Bean & Whitaker Mortg. Corp. v. Triduanum Fin., Inc.*, No. 2:09-cv-0954 FCD EFB, 2009 WL 2136986, *1 (E.D. Cal. July 15, 2009), the court stayed the case based on the Fifth Amendment interests of specific, indicted witnesses.

Defendants' description of the discovery procedures awaiting their hypothetical witnesses is also highly inaccurate. (*See* Jinhua Opp. at 11:1–5.) Such individuals are not parties to the lawsuit and therefore are not subject to interrogatories. *See* Fed. R. Civ. P. 33(a)(1). If they are current employees of the defendants, their depositions may be noticed but, otherwise, since they likely reside in China or Taiwan, they will not be subject to subpoena. Fed. R. Civ. P. 45(a)(2)(c)(1)(B)(i). The corporate defendants can produce documents related to those

hypothetical witnesses—if the documents are in the companies' possession—but such production implicates no Fifth Amendment issues.  *See Braswell,* 487 U.S. at 100.  What is more, the corporate defendants cannot artificially clothe themselves in a Fifth Amendment privilege by designating individuals with Fifth Amendment concerns to provide evidence for the corporation. *United States v. Kordel,* 397 U.S. 1, 8 (1970).

### C. Prosecution Abroad Raises No Fifth Amendment Concern.

The threat of prosecution in a foreign court does not trigger Fifth Amendment protection. *United States v. Balsys,* 524 U.S. 666, 669 (1998); *GLL GmbH & Co. Messeturm KG v. LaVecchia*, 247 F.R.D. 231, 233 (D. Me. 2008); (Micron Mot. at 18–19, n.4.).  In their oppositions, neither defendant disputes (or even mentions) that settled law.  Yet each attempts to justify the stay in part because their defense witnesses "may take the Fifth Amendment based upon having been named by Taiwan prosecutors as unindicted co-conspirators or otherwise material witnesses in connection with the criminal proceedings in . . . Taiwan." (UMC Opp. at 5:5–9; 11:5–6; 11:21–25; *accord* Jinhua Opp. at 5:10–16.)  That argument must be rejected.  The alleged concerns of UMC's and Jinhua's witnesses with regard to prosecution in Taiwan are entirely irrelevant.[4]

### D. Jinhua's August Trial Date Is a Red Herring: Even after the Trial, Defendants Will Make the Same Spurious Arguments for an Indefinite Stay.

Defendants insist that the stay should remain in place—and Micron will not be prejudiced—because "Jinhua's currently scheduled criminal trial is only 8 months away." (Jinhua Opp. at 12:12–13; UMC Opp. at 5:25–27.)  But defendants' focus on the Jinhua trial date is a tactical diversion.  The theory behind granting a civil stay until criminal proceedings are concluded is that, once the criminal charges are resolved, the civil defendant's witnesses can

---

[4] Defendants' suggestion that the civil stay should be prolonged until the Taiwan appellate process is concluded is even less tenable. (See UMC Opp. at 11:21–25, 13:3–6, 21:8–10; Jinhua Opp. at 5:10–16, 24:15–17.)  Defendants' only case on this issue, *800537 Ontario, Inc. v. World Imports U.S.A. Inc.,* 145 F. Supp. 2d 288, 290 (W.D.N.Y. 2001), concerned whether to stay a U.S. civil case based on two upcoming Canadian criminal trials (not appeals).  The court granted a stay not based on Fifth Amendment concerns—there were none—but because the outcome of the criminal trials would directly resolve the central dispute in the civil case. *Id.* at 291.  That is not the situation here.

participate in the defense without regard to Fifth Amendment concerns. They will either have been acquitted, or they will have been convicted, and the rule against double jeopardy will prevent any subsequent testimony from exposing them to further criminal liability. *See Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324–26 (9th Cir. 1995).

The resolution of the criminal charges against Jinhua, however, will *not* resolve the possible criminal exposure of UMC's and Jinhua's hypothetical defense witnesses. Even after Jinhua's conviction, those witnesses could claim to fear U.S. prosecution. Defendants' flawed logic produces an indefinite stay, and it must be rejected.

### III.   A Continued Stay Will Cause Micron Significant Prejudice.

Defendants also seek to justify the stay by contending that it will cause Micron no prejudice. Their arguments are not persuasive.

#### A.   Regardless of Jinhua's Placement on the Entity List, Micron's DRAM Business in China Remains under Threat.

Defendants first urge that "Jinhua has already been effectively enjoined since it remains on the Department of Commerce's Entity List," and that it has "effectively ceased operations." (Jinhua Opp. at 6:1–2; 12:18–22.) They also assert that Micron faces no risk from other state-owned DRAM companies in the PRC because "Jinhua has not provided its technology to any third parties, including any Chinese government agencies, officials, or any other Chinese companies." (Jinhua Opp. at 14:1–2; *see also id.* at 15:20–21.) And Jinhua contends that, in any case, because what it received from UMC was allegedly not the most cutting-edge DRAM technology, Micron has suffered no competitive harm. (*Id.* at 14:24–15:5.) The evidence supports none of these contentions.

Contrary to Jinhua's legal brief, Jinhua's own declarants—including Assistant President Jinfu Zheng—do *not* say that Jinhua has effectively ceased operations. (*See* Dkt. 261.) Nor could they credibly make that claim. Jinhua's own website makes clear that, at least as recently as December 2020, Jinhua was still recruiting engineers for DRAM R&D and manufacturing—posting no fewer than 33 job openings. (Wang Decl. ¶ 8; Ex. 1.)

///

1    Similarly—contrary to the characterizations of Jinhua's counsel (*see* Jinhua Opp. at 23:22–23)—Mr. Zheng's declaration does *not* say that Jinhua has never transferred DRAM technology to Chinese government agencies, officials, or other companies. Instead, Mr. Zheng's carefully crafted statement says that Jinhua made no such transfers "*after October 30, 2018.*" (Dkt. 261 (Jinfu Zheng Decl.) ¶ 8.) But that assurance is meaningless because UMC's plea agreement states that it transferred the F32 DRAM technology to Jinhua a month earlier—in *September* 2018. (UMC's Plea Agreement at 6 ¶ 2(n).) The meaning of Mr. Zheng's declaration is clear: *before* October 2018, Jinhua had indeed transferred DRAM technology to one or more third parties, who may still be using the technology. Discovery should be allowed to proceed so that Micron may seek remedies to limit the harm from Jinhua's ongoing use and apparent transfer of Micron technology to others.

Equally baseless is the suggestion that Micron's DRAM business will not be harmed because the technology transferred to Jinhua was supposedly not state-of-the-art. Despite defendants' repeated attempts to characterize the F32 DRAM project as a project related to "32nm process technology," (*see, e.g.,* UMC's Plea Agreement at 6–7 ¶ 2(o)), the evidence is clear that the F32 project related to *25nm* DRAM. (*See id.* at 8 ¶ 2(t) (indicating that Kenny Wang used Micron's DR*25*nmS design rule to advance the corresponding design rule of UMC); Dkt. 42-3 (Whonchee Lee Decl.) ¶¶ 9–10 (Stephen Chen gave presentation in which he stated that UMC had started developing 25nm DRAM technology); Wang Decl. ¶ 10 (Ho told Taiwan court that UMC was developing 25nm DRAM technology).)

In 2016—when defendants first committed their acts of misappropriation—25nm DRAM technology was state-of-the-art and competitive in the Taiwanese DRAM market. (Wang Decl. ¶¶ 9–10 (explaining that Ho's testimony in the Taiwanese criminal case confirmed that the F32 DRAM project concerned 25nm DRAM and noting that UMC and Jinhua misled Taiwanese authorities to obtain the necessary approval of their technology-sharing agreement).)[5] Moreover,

---

[5] Defendants do not deny that there are other government-owned, Chinese DRAM companies that could make use of Micron's stolen trade secrets. But they attempt to diminish Micron's concerns with citations to Micron's statements about its competitive strength in the Chinese market. (*See* Jinhua Opp. at 14:3–14.) Micron's statements do not support defendants' demands for a stay. As Manish Bhatia, Micron's Executive Vice President, explained, "it will take

UMC's theft was not limited to documents related to 25nm technology. (Declaration of Lucien Jan Bissey ("Bissey Decl.") ¶ 3.) UMC stole and still possesses (and presumably already transferred to Jinhua) documents and information related to process technology nodes generations more advanced than the 25nm process—including technologies that were not yet in commercial production at the time of the theft. (*See id.*) And because each DRAM process advancement reuses critical know-how from prior generations, once disseminated in September 2018, Micron's then-current DRAM technology gave any Chinese DRAM start-up a major head-start for its own programs to develop cutting-edge DRAM technologies. (*Id.* ¶ 4.) Until the stay is lifted, Micron will not have the tools to assess or mitigate that significant risk.

### B. Defendants' On-Going DRAM Patent Program Does Micron Significant Harm.

Defendants next seek to minimize the harm posed by their growing portfolio of U.S. DRAM patents, and they suggest that if Micron were really concerned, it could have sought a correction of patent inventorship in the USPTO. (UMC Opp. at 19:28–20:4; Jinhua Opp. at 13 n.4.) But those arguments fundamentally misunderstand the harm to Micron.

Once a patent issues, the threat is real that any trade secrets it discloses may forever lose trade-secret status. And since the value of keeping an invention as a trade secret often exceeds the value of a patent, mere patent reassignment is not an adequate remedy.

Nor are proceedings before the USPTO a meaningful substitute for this Article III Court. The procedural strictures there, the narrow limits of permissible discovery, and the unavailability of the most important forms of relief—*e.g.,* an injunction against further misappropriation—all make the USPTO an inferior forum to protect Micron's interests. *See, e.g.,* 37 C.F.R. § 42.51 (limited discovery); 77 Fed. Reg. 56068 (Sep. 11, 2012) (limited relief); 35 U.S.C. § 135(b), (d) (same). Defendants cannot insist on a stay in this Court based on Micron's prudent decision not to

---

time for Chinese newcomers to make a significant impact on the global memory chip market. . . ." (Dkt. 262 (Mario Moore Decl.) Ex. E at 64.) But the prolonged stay that defendants seek may provide precisely the time that Micron's Chinese DRAM competitors need to make headway based on Micron's stolen technology—first in the PRC market, and then globally. Mr. Bhatia "stressed that his company takes all competition seriously and is paying close attention to the progresses of emerging Chinese competitors." (*Id.*)

1  resort to less adequate channels of relief.

### C. A Prolonged Stay Jeopardizes Essential Evidence.

Defendants also trivialize the risk that important evidence will become unavailable during the stay, but their cavils fly in the face of established facts and common sense.

As Micron has shown, numerous Micron witnesses have left the company since the stay went into effect. (Dkt. 256-2 (Neal Meister Decl.) ¶ 3.) While former employees may still be available to serve as Micron witnesses, there is no guarantee—particularly where the individuals live outside the United States.

That problem becomes even more pronounced with regard to witnesses aligned with UMC and Jinhua. Defendants criticize "Micron's attempt to use its own employee attrition to justify the alleged loss of witnesses and evidence from UMC, Jinhua or third parties," (Jinhua Opp. at 16:3–4), but they are also quick to point out that "the Fifth Amendment rights of . . . current and *former* Jinhua and UMC employees are directly implicated" by Jinhua's pending criminal case. (*Id.* at 10:18–19 (emphasis added).) Clearly, defendants are aware of important witnesses who have left their employment. And despite submitting five declarations in opposition to Micron's Motion, neither defendant provides the Court any information about how many witnesses are affected. That fact is crucial because once those employees leave the defendants' employment, Micron's chances of obtaining discovery from them become remote. As third parties in China or Taiwan, they will be outside the subpoena power of the Court. *See* Fed. R. Civ. P 45(a)(2)(c)(1)(B)(i).

Nor is the risk of lost evidence confined to witness testimony. UMC does not deny that it has already been implicated in intentional efforts to conceal evidence.[6] And notwithstanding that Chen remains a Jinhua executive, defendants have not disputed that Chen actively helped Ho and

---

[6] UMC questions whether Micron's evidence supports the fact that the "Taiwan Taichung District Court has already found that a UMC senior manager ordered the destruction of relevant evidence." (Jinhua Opp. at 16:24–27.) But the Taiwan court's press release leaves no doubt on this score: "Letian Rong [a senior manager at UMC] asked . . . Wang and . . . He [a/k/a "Ho"] to delete the materials of Micron Technology, Inc. (USA) and Micron Technology, Inc. (Taiwan), etc. held by them." (Dkt. 256-4, Wang Decl. Ex. 1, at 8.) UMC's confusion may stem from Micron's citation to Exhibit page numbers, applied as required by the Local Rules, rather than to the original page numbering of the press release. In any case, defendants know the facts, and their persistent refusal to acknowledge and address proven spoliation of evidence only strengthens Micron's concerns over a continued stay.

1  another employee circumvent detection of their misappropriation by UMC's IT department, and
2  that on Chen's watch, a key laptop containing Micron trade secrets was hidden from investigators.
3  (*See* Micron Mot. at 15:4–15.)  Rather than deny these facts—much less introduce evidence to
4  controvert them—defendants claim the facts are irrelevant because litigation hold notices have
5  now been circulated and Micron cannot prove that defendants will engage in further spoliation of
6  evidence.  (UMC Opp. at 20:9–21; Jinhua Opp. at 17:1–6.)

7  That is not Micron's burden.  In every one of the cases cited on this issue, the relevant
8  parties and third parties would have known they were under an obligation to preserve evidence,
9  and they were, in principle, capable of doing so.  Nevertheless, the courts held that the possible,
10 inadvertent destruction of evidence was a factor militating against a stay.  *Genentech, Inc. v. JHL*
11 *Biotech, Inc.*, No. C 18-06582 WHA, 2019 WL 1045911, at *25 (N.D. Cal. Mar. 5, 2019); *Cal-*
12 *Cleve, Ltd. v. Wrag-Time Air Freight, Inc.*, No. CV 04-10543 SJO (JTLx), 2005 WL 8157878, at
13 *4 (C.D. Cal. May 20, 2005).  That conclusion is all the more compelling here where defendants'
14 intentional destruction of evidence is a matter of public record.

15 **IV.    Lifting the Stay Will Not Give U.S. Prosecutors an Unfair Advantage.**

16 With no convincing argument to discount the prejudice Micron would suffer from a
17 continued stay, defendants pivot to the second *Keating* factor—the purported prejudice they would
18 suffer if a stay were denied.  Here, defendants make two arguments.  The first—that key defense
19 witnesses will necessarily assert the Fifth Amendment—is not cogent and has already been
20 addressed.  *See* Section II, *supra.*  The second argument turns on the fact that civil litigation
21 provides more robust discovery tools than are available in criminal procedure and the contention
22 that prosecutors should not be able to use parallel civil litigation to enhance their arsenal in the
23 criminal proceedings.  (UMC Opp. at 13:24–28; *accord* Jinhua Opp. at 9:17–25.)  That second
24 argument also fails for at least two reasons.

25 *First,* the argument does not apply to UMC.  Following its guilty plea, there is no pending
26 criminal action against UMC, so civil discovery obviously cannot unfairly reveal *UMC's* criminal
27 defense strategy.  (*See* Micron Mot. at 19:18–20:2) citing *Shirsat v. Mut. Pharm. Co.*, No. CIV.A
28 93-3202, 1995 WL 695109, at *3 (E.D. Pa. Nov. 21, 1995) – a case defendants pass over in

silence.)

More importantly, UMC's plea agreement requires it to cooperate with the government to assist in the successful prosecution of Jinhua, Chen, Ho, and Wang. (UMC's Plea Agreement at 11–12 ¶ 9.) Having agreed to help prosecutors in exchange for a lighter sentence, UMC cannot also claim a right to keep evidence of Jinhua's misconduct from being exposed.

*Second,* even as to Jinhua, the argument ignores the tools at hand to protect against unfair prejudice. As explained in Micron's Motion, the Court has already issued a Protective Order in this civil case. That Protective Order forbids Micron from sharing anything learned through pre-trial discovery with prosecutors without first giving Jinhua an opportunity to object. In their opposition, neither defendant even mentions the Court's Protective Order—much less attempts to explain why the notice-and-objection procedure would prove inadequate to protect Jinhua's legitimate interest in a fair criminal trial. Yet when the legitimate interests of the accused can be protected by less restrictive measures than a civil stay, those more moderate measures should be preferred. *See, e.g., Applied Materials, Inc. v. Semiconductor Spares, Inc.*, No. C95-20129RMW(EAI) & C95-20156RMW(PVT), 1995 WL 261451, at *3 (N.D. Cal. Apr. 26, 1995) (*citing Favaloro v. S/S Golden Gate*, 687 F. Supp. 475, 482 (N.D. Cal. 1987).

Jinhua's cases do not change the result. In both *Federal Insurance Co. v. Laney* and *Square 1 Bank v. Lo*, the decisive factor in the court's decision to grant the stay was that the defendants were individuals with important Fifth Amendment rights. *See Fed. Ins. Co. v. Laney*, No. C 12-04708 WHA, 2013 WL 594267, at *3 (N.D. Cal. Feb. 14, 2013); *Square 1 Bank*, 2014 WL 7206874, at *2. Neither court considered the situation of a corporate defendant (without Fifth Amendment rights) whose right to a fair trial was safeguarded by the court's own protective order.

**V.     The Court's Own Interests Favor Lifting the Stay.**

As explained in Micron's motion and in Section I, *supra,* judicial efficiency also militates against a continued stay. The prolonged stay that defendants request would postpone meaningful deposition discovery into 2023, 2024, or even 2025—with dispositive motions anticipated thereafter. That would require the Court and its staff to learn complex facts concerning DRAM technology and the DRAM market over and over again. The defendants' response is two-fold.

First, they suggest that the Jinhua criminal case will somehow provide significant evidence for the parties and Court to use in the civil case, allegedly simplifying discovery. (UMC Opp. at 5:23–27; Jinhua Opp. at 5:17–22.) Second, they contend that the criminal trial will simplify the civil case by resolving most of the disputed issues. (UMC Opp. at 16:3–6; Jinhua Opp. at 20:20–27.) Neither suggestion is tenable.

As defendants themselves correctly observe, far fewer discovery tools are available in the criminal process. The government will not have the benefit of interrogatories or depositions, and defendants claim that all their important witnesses will assert the Fifth Amendment—and so offer no testimony. In addition, the criminal case is significantly narrower than the civil one: the indictment alleges only eight trade secrets while we now know (after only limited civil discovery) that UMC wrongfully possessed over 20,000 Micron documents. (*See* Dkts. 230 (SAC) ¶ 54; 233-3 (Ho Depo.) at 4:15–9:21, 16:23–17:23, 29:4–17, 39:16–22.) The claim that the criminal trial will expose most of the evidence relevant for the civil case is not plausible.

Nor does the second argument have greater weight. Quoting the Court's earlier stay decision, defendants contend that the "vast majority of factual disputes pertaining to liability in the instant case are likely to be resolved in the course of the criminal case." (Jinhua Opp. at 17:10–12.) Then, apparently hoping to show that that prediction has been fulfilled, defendants go on to argue "the parallel criminal case against UMC supported the Court's finding, as the criminal investigation against UMC has significantly narrowed to one count." The argument is highly misleading.

*First,* the Court originally concluded that the criminal trial might resolve a majority of factual disputes in the civil case *before* UMC entered its guilty plea and brought a premature close to one half of the government's case. As UMC emphasizes, it pleaded guilty to the misappropriation of only one Micron trade secret out of eight and, as recently as its opposition briefing to this Motion, UMC insists (falsely) that there is no evidence it used that trade secret in what it transferred to Jinhua. (*See* UMC Opp. at 5:14–17, 7:25–8:2, 19:14–17; 20:28–21:2.) While UMC's plea will have significant preclusive effects in the civil case, it also ensures that many factual issues related specifically to UMC's wrongdoing will not be litigated or decided in

the criminal trial.

The suggestion that "the criminal investigation against UMC" has somehow "narrowed to one count" is a transparent sophistry.  Through a *plea bargain*, UMC agreed to pay a $60 million fine in exchange for the government exercising its discretion to withdraw the original Indictment and charge UMC with only a single count.  (*See* UMC's Plea Agreement at 2 ¶ 1, 12 ¶ 10.)  Nothing in the plea agreement exonerates UMC from its much broader campaign of misappropriation.  The contours of that campaign will be the subject of extensive civil discovery—beginning with the production and inspection of documents and things.  The stay should be lifted, allowing such discovery to begin.[7]

### VI. Public and Third-Party Interests Militate against a Continued Stay.

Defendants argue that public and third-party interests favor the stay based on the policy imperative of safeguarding the integrity of the criminal process.  (UMC Opp. at 13:23–14:4; Jinhua Opp. at 19:14–20:2.)  But for the reasons explained above, that reasoning fails: lifting the stay now will in no way undermine the integrity of the criminal proceedings.

At the same time, defendants consistently ignore the unambiguous federal policy choices embodied in the DTSA.  Congress enacted that law to create a civil right of action based on conduct that was already a crime under the Economic Espionage Act, 18 U.S. Code § 1831.  *See* S. Rep. No. 114-220, at 3 (2016); H.R. Rep. No. 114-529, at 1–2 (2016).  Thus, any defendant sued under the DTSA would be expected to have potential Fifth Amendment concerns.  *See id.*  Yet nothing in the statute or the legislative history suggests that Congress sought to create a presumption favoring a stay of civil proceedings during a parallel criminal case.

Far from enacting a civil remedy meant to serve as a secondary right of action, available only after the conclusion of any related criminal proceedings, Congress intended the DTSA to

---

[7] Defendants' vague expressions of concern over "duplicative" motion practice, "contentious disagreements" over the scope of permissible discovery, and other (unnamed) "complexities" are equally unpersuasive.  (*See* UMC Opp. at 5:28–6:2, 16:6–9; Jinhua Opp. at 5:23–25, 19:3–7.)  The defendants' anticipated motions to dismiss the civil complaint have no counterpart in the criminal case; there will be no motions to compel discovery on the criminal side; and Jinhua's criminal trial will conclude long before dispositive motions in the civil case will be heard.

"ensure an effective and efficient remedy for trade secret owners whose intellectual property has been stolen." S. REP. No. 114-220, at 14; H.R. REP. No. 114-529, at 6.  This desire that "[v]ictims will be able to move quickly to Federal court, with certainty of the rules, standards, and practices to stop trade secrets from winding up being disseminated and losing their value," *id*. at 14–15; *id*. at 6, cannot be squared with putting victims' trade secret claims indefinitely on hold, subject to the vicissitudes of parallel criminal prosecutions.

**VII.   Conclusion**

As requested in its Motion, Micron respectfully asks that the Court lift the stay in full or, at a minimum, lift the stay as to UMC.  When the stay is lifted, Micron requests a status conference to address the subsequent timing and sequence of motion practice and discovery.

Dated:  December 28, 2020

JONES DAY

By: *s/ Randall E. Kay*
       Randall E. Kay

Attorneys for Plaintiff
MICRON TECHNOLOGY, INC.